**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Allan Ray HATTAWAY, Thomas Stimac, Robert George Burroughs, and Marty Curran, Defendants-Appellants.**

Nos. 83–1580, 83–1779, 83–1780 and 83–1940.

United States Court of Appeals, Seventh Circuit.

Argued April 6, 1984.

Decided July 31, 1984.

Certiorari Denied Nov. 13, 1984.
See 105 S.Ct. 448.

Donald B. Mackay, James A. Graham, Seiden & Shapiro, John Thorne, Kirkland & Ellis, Chicago, Ill., for defendants-appellants.

William R. Coulson, Deputy Chief, Cr. Div., U.S. Atty., Dan K. Webb, U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before BAUER and ESCHBACH, Circuit Judges, and JAMESON, Senior District Judge.*

* The Honorable William J. Jameson, Senior Judge of the United States District Court for the District of Montana, is sitting by designation.

BAUER, Circuit Judge.

In May 1982, the government indicted six persons on charges of conspiracy, kidnapping, violation of the Mann Act, and unlawful use of firearms in connection with the alleged abduction and holding of a North Carolina woman. After a three-week jury trial, five of the defendants were convicted of various charges and one was acquitted. Defendants Hattaway, Stimac, Curran, and Burroughs appeal their convictions. The fifth convicted defendant, Gary Miller, has not appealed. We affirm.

I

The charges against the defendants arose out of the alleged abduction, transportation, and holding of Darlene Callahan in North Carolina, Illinois, and Indiana. The sequence of events is largely undisputed. Darlene Callahan and her boyfriend, Tom Forester, lived near Asheville, North Carolina. Forester was a drug dealer and Callahan was a prostitute who helped deliver drugs for Forester. Defendant Hattaway also lived in North Carolina, where he was associated with the Outlaws motorcycle gang. On December 12, 1981, Hattaway learned that Forester had taken Hattaway's motorcycle. Later that evening, Hattaway and his friend Gary Miller went to the motel room in Asheville where Callahan and Forester were staying. Hattaway asked Forester where his motorcycle was and whether Forester had the money he owed Hattaway for prior drug transactions. Hattaway and Miller then abducted Forester and Callahan at gunpoint and drove them to the Ore Knob mine. On the way they discussed how Forester and Callahan could earn money to repay the debt owed to Hattaway. At the mine, Hattaway and Forester left the car and went inside, where Hattaway allegedly pushed Forester down a mineshaft to his death. During their absence, Miller sexually assaulted Callahan.

When Hattaway returned, he and Miller drove with Callahan to Chicago. During the trip, Miller again sexually assaulted Callahan. Hattaway told Callahan that he might sell her, he might give her to the Outlaws living in the Chicago area, or he might keep her as his "old lady."[1] On the evening of December 13, the three arrived in Lyons, Illinois, where they stayed in a motel. Defendant Curran, a member of the Chicago Outlaws, came to the motel the next evening. Hattaway ordered Callahan to have sexual intercourse with Curran; Callahan also had intercourse again with Miller. The next day they went to another motel in Lyons. Defendant Stimac, a leader of the Chicago Outlaws, joined them that evening. Hattaway gave Stimac one hundred dollars to buy Callahan some clothes. The following day, Stimac left with Callahan and introduced her to Defendant Burroughs, a member of a Canadian Outlaws group. Stimac and Burroughs took Callahan to yet another motel, where Burroughs had sexual intercourse with Callahan. Burroughs told her that he, Stimac, or Curran could get her a job as a prostitute. Burroughs also warned her that a good way to control "old ladies" was to "cut them across the forehead and make them bleed."

On December 17, Burroughs and Stimac drove Callahan to Stimac's house in Hinsdale, Illinois. There Callahan met Stimac's "old lady," Toni Summers, who was a dancer and occasional prostitute. Summers was the sixth defendant at the trial. Defendant Curran arrived and told Callahan to have sex with Stimac. Afterwards, Curran and Stimac asked Callahan whether she preferred to work as a prostitute, or both as a dancer and a prostitute. Curran then drove Callahan to a farmhouse near Gary, Indiana, called "The Flats," where the Outlaws trained new members. Callahan stayed there for five days, during which she had sexual intercourse with Curran. Callahan and Curran then returned to Stimac's Hinsdale house, where Callahan remained with Curran, Burroughs, Stimac,

---

**1.** The United States Attorney informs us that the Outlaws use the term "old lady" to describe their girlfriends. See Appellee's br. at 10 n. 2.

and Summers until Christmas Eve. They had dinner on Christmas Day at Stimac's mother's house, where Callahan was introduced as Curran's "old lady." That evening, Stimac took Callahan and Summers to an "X-rated" motel, where Callahan engaged in a "threesome" with Stimac and Summers.[2]

For the next several days, Callahan lived at the Hinsdale house, at Summer's apartment in Glendale Heights, and at a house called the "Ponderosa." On January 4, 1982, police in North Carolina arrested Gary Miller on the charge of abducting Callahan and her boyfriend Tom Forester. Upon Curran's and Stimac's instructions, Callahan called the Asheville police on January 7 and told them she had not been kidnapped. On January 25, North Carolina authorities recovered Forester's body from the Ore Knob mineshaft. That afternoon, Curran took Callahan to a motel and then left. A frightened Callahan attempted to call Gary Miller's home; he was not at home, so Callahan called her mother for the first time since she had left North Carolina. Her mother told Callahan that the authorities had found Forester's body, and advised her to call the FBI. After

Callahan telephoned the FBI, two police officers arrived and took her away.

The government indicted Hattaway, Miller, Stimac, Curran, Burroughs, and Summers on charges of conspiracy, kidnapping, Mann Act violations, and unlawful firearms use. The defendants were tried jointly before a jury. The principal defense theory at trial was that Darlene Callahan consented to being taken to Chicago and to remaining there. The court acquitted Toni Summers at the close of the government's case. The other defendants were found guilty of various charges and sentenced to terms ranging from three years to forty years.[3]

## II

Defendants Hattaway, Stimac, Curran, and Burroughs appeal their convictions on several grounds. Their appeals have been consolidated.

### A. *Joinder of Defendants*

 Hattaway and Stimac argue that they were misjoined in the indictment and at trial in violation of Rule 8(b) and Rule 14 of the Federal Rules of Criminal Procedure. The district court denied their pretrial motions for severance. Rule 8(b) allows the government to charge two or

2. Callahan explained the term "threesome" in the following colloquy between herself and the United States Attorney during her direct examination at trial:

 Q. And in the parlance, what is a threesome?

 A. It is where a woman goes with another woman and the man, you all go together at the same time, sex.

3. The following table summarizes the charges, verdicts, and sentences of each defendant:

| Name | Charges | Verdicts | Sentences |
|---|---|---|---|
| Gary Miller | A B C D E | Guilty: All charges | 40 years, plus 15 years consecutive probation |
| Allan Hattaway | A B C D E | Guilty: All charges | 30 years, plus 15 years consecutive probation |
| Thomas Stimac | A B C D E | Guilty: A B C E Not guilty: D | 15 years, plus 5 years consecutive probation |
| Marty Curran | A B C D E | Guilty: A B C E Not guilty: D | 4 years, plus 5 years consecutive probation |
| George Burroughs | A B C D E | Guilty: C Not guilty: A B D E | 3 years |
| Toni Summers | A B D E | Not guilty: All charges | — |

Key to charges:
A—Conspiracy to kidnap, 18 U.S.C. § 1201(c) (1978)
B—Kidnapping, 18 U.S.C. § 1201(a)(1) (1978)
C—Conspiracy to violate Mann Act, 18 U.S.C. § 371 (1948)
D—Mann Act violation, 18 U.S.C. § 2421 (1949)
E—Unlawful firearms use, 18 U.S.C. § 924(c)(1) (1968)

more defendants in the same indictment if the indictment alleges that the defendants "participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses." Fed. R.Crim.Pro. 8(b). It is well-established that a conspiracy charge ordinarily is sufficient to satisfy Rule 8(b)'s joinder requirements. *See, e.g., United States v. Ras,* 713 F.2d 311, 315 (7th Cir.1983); *United States v. Garza,* 664 F.2d 135, 142 (7th Cir.1981), *cert. denied,* 455 U.S. 993, 102 S.Ct. 1620, 71 L.Ed.2d 854 (1982). Here, the government charged a continuous conspiracy to hold Callahan, begun by Hattaway and Miller in North Carolina and joined by Stimac, Curran, and Burroughs in Chicago. Although bad faith in charging a conspiracy may render joinder improper, Hattaway and Stimac have failed to allege that the government charged them with conspiracy in bad faith. The record contains ample evidence of a conspiracy, and we hold that Hattaway and Stimac properly were joined under Rule 8(b).

■ Hattaway and Stimac next argue that the district court erred in denying their motions for separate trials under Rule 14 of the Federal Rules of Criminal Procedure. The trial court's ruling on a Rule 14 motion for severance is committed to its sound discretion, and we will not overturn the court's decision absent clear abuse of discretion. *United States v. Hedman,* 630 F.2d 1184, 1200 (7th Cir.1980), *cert. denied,* 450 U.S. 965, 101 S.Ct. 1481, 67 L.Ed.2d 614 (1981). The defendants have the burden of showing that their joint trial resulted in prejudice. *United States v. Ras,* 713 F.2d 311, 315 (7th Cir.1983). Hattaway and Stimac each point to the alleged bad acts of the other defendants to show that they were prejudiced by the joint trial. Hattaway claims that he was prejudiced by evidence of the "terror, indignities and inhumane treatment" of Darlene Callahan by Stimac and the other Chicago Outlaws, while Stimac contends that he was prejudiced by evidence of Callahan's abduction and "subsequent abuse and mistreatment" in North Carolina by Hattaway and Gary Miller.

■ A strong judicial policy favors joint trial of defendants where largely the same evidence would be admitted in separate trials of each defendant. *See United States v. McPartlin,* 595 F.2d 1321, 1333 (7th Cir.), *cert. denied,* 444 U.S. 833, 100 S.Ct. 65, 62 L.Ed.2d 43 (1979). Here, under the government's conspiracy theory, Darlene Callahan's abduction in North Carolina was connected with her subsequent treatment in Chicago. The evidence surrounding Callahan's abduction thus would have been admissible at a separate trial for Stimac, just as the evidence of Callahan's Chicago activities would have been relevant during a separate trial for Hattaway. The district court thus did not abuse its discretion in denying the motions for severance. In addition, the policy considerations of judicial economy and of sparing Darlene Callahan from repeating the embarrassing accounts of her sexual abuse show the wisdom of the district court's decision not to sever.

B. *Admissibility of Evidence on Forester's Death and "Lifestyle" Evidence*

■ Hattaway, Stimac, and Curran contend that the district court improperly allowed the government to introduce evidence regarding Tom Forester's death and the Outlaws' lifestyle. The defendants claim that admitting this evidence violated both Rule 404(b) of the Federal Rules of Evidence because the evidence was submitted to prove the defendants' bad character, and Rule 403 because the danger of unfair prejudice outweighed the probative value. The defendants first object to the admission of evidence surrounding Forester's death. The government counters that the killing was an intricate part of the kidnapping and Mann Act offenses, and thus its probative value outweighed the risk of unfair prejudice. The government also claims that the evidence meets the exception in Rule 404(b) allowing evidence of other crimes and bad acts to show motive. The district court has broad discretion to determine the admissibility of evidence, and thus we will reverse the court's evidentiary rulings only upon a clear showing of abuse of discretion. *See United States v. Brown,* 688 F.2d 1112, 1115 (7th

Cir.1982). We agree with the government that the district court did not abuse its discretion.

The evidence of Forester's death helped the jury understand many important factors surrounding Callahan's abduction and holding. It helped show that Callahan did not consent to leaving the motel and to traveling with the defendants. It also showed the defendants' possible motivation for taking Callahan to Chicago and for abandoning her after Forester's body was discovered. Finally, the evidence helped explain why Callahan decided to call the FBI. As the government states, excluding this evidence would have left a "chronological and conceptual void" in the story of Callahan's ordeal. This evidence thus both showed motive, as permitted in Rule 404(b), and was highly relevant to the alleged criminal acts.

Furthermore, we find that the risk of unfair prejudice from this evidence did not substantially outweigh its probative value. The defendants assert that evidence of murder during a trial on a lesser offense can be highly prejudicial and inflammatory. *See, e.g., United States v. Ostrowsky*, 501 F.2d 318 (7th Cir.1974). Yet virtually all evidence submitted by the prosecution is prejudicial to the defendant; the relevant inquiry is whether any unfair prejudice from the evidence substantially outweighs its probative value. Here, the district court carefully restricted the prejudicial effect of this evidence by limiting the details of the killing and by convincing the parties to stipulate to the details of the body's recovery. Balanced against the great probative value of this evidence, we find that the district court did not abuse its discretion in admitting evidence of Tom Forester's death.

▉ Second, Curran and Stimac argue that the district court improperly admitted evidence of the Outlaws' lifestyle, including information about their sexual activities, drug use, gang paraphernalia, nicknames, and other "socially unacceptable" activities. We conclude that all this evidence was relevant to provide an accurate description of Callahan's ordeal. Evidence of drug and alcohol use helped substantiate the govern-

ment's claim that the defendants used psychological control to keep Callahan with them. Information about the Outlaws' use of violence against women showed how Callahan was intimidated into staying in Chicago. Moreover, the evidence of sexual activity was relevant to the Mann Act charges. *See United States v. Phillips*, 640 F.2d 87 (7th Cir.), *cert. denied*, 451 U.S. 991, 101 S.Ct. 2331, 68 L.Ed.2d 851 (1981) (Mann Act conviction upheld for non-consensual sexual activity, although no commercial prostitution attempted). Finally, because the Outlaws used their nicknames (such as "Hitler," "Mad Mad Dog," "Scarface," and "Crazy Horse") to identify themselves in Callahan's presence, forbidding Callahan from using these names would have placed an undue burden on her testimony.

Although the defendants argue vigorously that this evidence was disgusting and offensive, a proposition with which we hardly can disagree, the defendants do not suggest that it painted an inaccurate picture of life with the Outlaws. The evidence was not admitted to prove bad character; rather, it was intricately related to the facts of this case. Its admission thus did not violate Rule 404. Moreover, as with the evidence about Forester's death, the probative value of this "lifestyle" evidence outweighed any risk of unfair prejudice. We conclude, therefore, that admitting this evidence was not an abuse of the district court's discretion.

### C. Government's Rebuttal Argument

▉ Hattaway, Stimac, and Curran next contend that the prosecutor's rebuttal argument contained improper remarks that constitute reversible error. The test for determining if a prosecutor's statements in closing argument require reversal of a conviction is whether the remarks were so prejudicial that the defendant was deprived of a fair trial. *United States v. Zylstra*, 713 F.2d 1332, 1339–40 (7th Cir.), *cert. denied*, —— U.S. ——, 104 S.Ct. 403, 78 L.Ed.2d 344 (1983); *United States ex rel. Clark v. Fike*, 538 F.2d 750, 760 (7th Cir. 1976), *cert. denied*, 429 U.S. 1064, 97 S.Ct. 791, 50 L.Ed.2d 781 (1977). The trial court ruled that none of the prosecutor's remarks

constituted reversible error, and our review of the record convinces us that the trial court's ruling was correct.

■ Hattaway argues that the prosecutor "ridiculed" the presumption of innocence by telling the jury "not to pay lip service to some slogan." Tr. at 1853. When the prosecutor's comment is examined in context, however, the slogan to which the prosecutor referred might have been certain obscure Latin phrases evoked by counsel for Stimac and Miller during their closing arguments, instead of the presumption of innocence. See tr. at 1852–53.[4] The prosecutor's comment was at most ambiguous; it certainly did not deprive Hattaway of a fair trial.

■ Curran contends that the prosecutor improperly suggested that Curran stole the purse of a woman in Milwaukee, from which Curran obtained an I.D. card which he later gave to Darlene Callahan. The court overruled Curran's objection to this argument. In light of the circumstantial evidence suggesting that Curran was involved in procuring the I.D. card, we find that the prosecutor's remark was not improper. Furthermore, any prejudicial effect of this argument certainly was minimal, as an allegation of purse-stealing is far less serious than the kidnapping, Mann Act, and firearm violations with which Curran was charged.

■ Stimac and Curran next argue that the prosecutor's statement that they knew about Tom Forester's death was unsupported by the record and so unfairly prejudicial as to require a reversal of their convictions. The trial court sustained the defendants' objections to the prosecutor's statements at trial. See tr. at 1842. The prosecutor's argument was based, however, on a reasonable inference from the evidence. Although there exists no direct evidence that Stimac and Curran were told that Tom Forester had been killed, the fact that they abandoned Darlene Callahan after the North Carolina authorities discovered Forester's body supports the government's claim that they were aware of the

circumstances surrounding Forester's death. The evidence thus lends at least some support to the prosecutor's argument, and the defendants have not shown that this single comment during the three-week trial deprived them of a fair hearing. We hold that the prosecutor's remark was not reversible error.

■ Finally, Stimac and Curran argue that the prosecutor committed reversible error by stating that Stimac was involved in the drug debt that Forester owed to Hattaway. During the trial, the court specifically forbade the government from introducing evidence about drug dealings between the Chicago defendants and the North Carolina defendants. See tr. at 1222. We find no support for the government's contention that the trial court's order permitted the introduction of evidence about drug transactions between the defendants. The prosecutor's references to Stimac's connection with the Forester-Hattaway drug debt thus were improper. We find three such references: the first was made without objection, see tr. at 1830–31; counsel objected to the second reference, to which the court responded, "The jury has heard the evidence and will follow only the evidence. Proceed.", see tr. at 1833; and the court sustained the objection to the third reference, see tr. at 1848–49. Although all of these references were improper, we must "examine the allegedly prejudicial remarks of the prosecution in the context of the trial as a whole." *United States ex rel. Garcia v. Lane*, 698 F.2d 900, 902 (7th Cir.1983). The length of the trial, the many contested issues of credibility and motive, and the sordid details involved in this case convince us that the prosecutor's references were not so inflammatory that they deprived the defendants of their right to a fair trial.

■ As this court observed many years ago, a prosecutor is "free to comment legitimately and to speak fully although harshly upon the action and conduct of the accused, if the evidence supports his comments, as

---

4. The two phrases were "non sub homine sed sub Deo et leges," tr. at 1714, and "no allegata without probata," apparently Latin in a North Carolina dialect, tr. at 1718.

is the accused's counsel to comment upon the nature of the evidence and the character of the witnesses which the Government produces." *United States v. Freeman,* 167 F.2d 786, 791 (7th Cir.), *cert. denied,* 335 U.S. 817, 69 S.Ct. 37, 93 L.Ed. 372 (1948), *quoted in United States v. Spain,* 536 F.2d 170, 174 (7th Cir.), *cert. denied,* 429 U.S. 833, 97 S.Ct. 96, 50 L.Ed.2d 97 (1976). The evidence supported nearly all of the remarks that the prosecutor made during his closing argument. That the prosecutor's comments strayed briefly from the record perhaps is not surprising due to the complexity of this case. None of the remarks were so inflammatory and prejudicial, however, as to require a reversal of the defendants' convictions.

### D. *Sufficiency of the Evidence*

■ Hattaway claims that his co-defendants' statements were admitted improperly at trial, that absent these statements the evidence was insufficient to show that he joined a conspiracy to kidnap or a conspiracy to violate the Mann Act, and that thus he is entitled to acquittal on the conspiracy counts. Viewing the facts and inferences in a light most favorable to the government, *see Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), we conclude that the evidence of Hattaway's conspiracy involvement from Hattaway's own acts and statements was sufficient to support the jury's verdict. Hattaway abducted Darlene Callahan and discussed at least twice the possibility of taking her to Chicago to work to pay off Tom Forester's debt. Hattaway also drove Callahan to Chicago, where he delivered her to the Chicago Outlaws. This evidence was sufficient for the jury to conclude beyond a reasonable doubt that Hattaway was part of a conspiracy. We thus need not address Hattaway's contention that his co-defendants' statements were admitted improperly.

### E. *Burroughs' Conspiracy Conviction*

Burroughs contends that the evidence does not support his conviction of conspiring to violate the Mann Act because the record does not show that he knew Darlene Callahan had been taken across state lines. The Mann Act applies to anyone who

"knowingly transports in interstate ... commerce ... any woman ... for the purpose of prostitution or debauchery ...." 18 U.S.C. § 2421 (1949). The government counters that the interstate transportation requirement of the Mann Act is an element of federal jurisdiction and not part of the knowledge requirement for a Mann Act conviction.

We agree with the government's interpretation. Although the government has cited no Mann Act cases directly on point, a plethora of reported decisions involving other federal criminal statutes have held that a defendant's knowledge of the federal aspect of the crime is not required to support a conviction; rather, the interstate or other federal requirement is intended only to establish federal jurisdiction. *See, e.g., United States v. Feola,* 420 U.S. 671, 95 S.Ct. 1255, 43 L.Ed.2d 541 (1975) (assault on federal officer, 18 U.S.C. § 111 (1948)); *United States v. Hamilton,* 726 F.2d 317 (7th Cir.1984) (unlawful conversion of CETA funds, 18 U.S.C. § 665(a) (1973)); *United States v. Bankston,* 603 F.2d 528 (5th Cir.1979) (kidnapping across states lines, 18 U.S.C. § 1201 (1978)); *United States v. Eisenberg,* 596 F.2d 522 (2d Cir.), *cert. denied,* 444 U.S. 843, 100 S.Ct. 85, 62 L.Ed.2d 56 (1979) (interstate transportation of counterfeit goods or securities, 18 U.S.C. § 2314 (1968)); *United States v. Green,* 523 F.2d 229 (2d Cir.1975), *cert. denied,* 423 U.S. 1074, 96 S.Ct. 858, 47 L.Ed.2d 84 (1976) (theft of goods in interstate commerce, 18 U.S.C. § 659 (1970)); *United States v. Gardner,* 454 F.2d 534 (4th Cir.), *cert. denied,* 409 U.S. 867, 93 S.Ct. 164, 34 L.Ed.2d 116 (1982) (possession of stolen mail, 18 U.S.C. § 1708 (1952)); *United States v. Roselli,* 432 F.2d 879 (9th Cir.1970), *cert. denied,* 401 U.S. 924, 91 S.Ct. 883, 27 L.Ed.2d 828 (1971) (use of interstate facilities to aid racketeering enterprises, 18 U.S.C. § 1952 (1970)). The United States Supreme Court aptly described the policy underlying these interpretations when it stated that the "[o]ffender takes his victim as he finds him. The concept of criminal intent does not extend so far as to require that the actor understand not only the nature of his act but also its

**1428**

consequence for the choice of a judicial forum." *United States v. Feola*, 420 U.S. 671, 685, 95 S.Ct. 1255, 1264, 43 L.Ed.2d 541 (1975).

■ The same conclusion applies to the Mann Act. The substantive offense of the Act is the transporting of a woman for immoral purposes, and crossing a state line merely confers federal jurisdiction for prosecution purposes. The defendant's knowledge of whether a state line has been crossed thus is irrelevant to whether he has violated the Mann Act; otherwise, a defendant could argue ignorance of geography as a valid Mann Act defense. *Cf. Batsell v. United States*, 217 F.2d 257 (8th Cir.1954) (Mann Act conviction upheld where bad roads forced defendant to detour through Wisconsin en route between two Minnesota towns). Because interstate knowledge is not necessary to support a Mann Act conviction, neither is interstate knowledge required to convict a defendant for conspiring to violate the Mann Act. *See United States v. Feola*, 420 U.S. 685.

■ The record sufficiently supports the verdict that Burroughs knowingly joined the conspiracy to transport Callahan for prostitution and debauchery. After Stimac introduced Callahan to Burroughs on December 16, Burroughs took Callahan to a motel where he sexually assaulted her. Burroughs also told her that he or Stimac or Curran could set her up as a prostitute, and he described how cutting "old ladies" across the forehead made them easier to control. The next day, Burroughs took Callahan to Stimac's house, where Burroughs resided for several days. Finally, Burroughs met at least twice with Stimac and Curran after Miller was arrested in North Carolina. Burroughs' role in the whole ordeal was less than Stimac's or Curran's, and his lesser participation is reflected by his shorter sentence and his acquittal on all but one charge. Yet his involvement was not so minimal as to absolve him from all culpability.

### III

The trial court was required to make many difficult decisions over the course of this three-week trial. We commend the court for dealing so competently with these complicated and often emotionally-charged issues. The defendants' convictions are affirmed.

AFFIRMED.