**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Carey ROBINZINE, Defendant–Appellant.**

No. 94–3758.

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 27, 1995.

Decided April 4, 1996.

Christopher Cook (argued), Office of ·the United States Attorney, Criminal Division, Barry Rand Elden, Chief of Appeals, Office of the United States Attorney, Criminal Ap-

pellate Division, Chicago, IL, for Plaintiff-Appellee.

Ronald J. Clark (argued), Chicago, IL, for Defendant-Appellant.

Before FLAUM, ROVNER, and EVANS, Circuit Judges.

FLAUM, Circuit Judge.

Carey Robinzine was convicted by a jury of knowingly transporting a person under the age of eighteen across state lines for the purpose of having that minor engage in prostitution, in violation of 18 U.S.C. § 2423.[1] Robinzine appeals his conviction based on certain evidentiary claims and the enhancement of his sentence for obstruction of justice. We affirm both the conviction and the sentence.

## I.

In February of 1993, M.K. met Carey Robinzine at a party at Robinzine's home in Roseville, Minnesota. M.K. was 16 years old at the time, and she told Robinzine this. Robinzine told M.K. he was 23 years old, though he was actually 39. The two began dating and saw each other regularly until July of that year. M.K. considered Robinzine to be her boyfriend. She testified that during this period they had consensual sex three times, the second of which Robinzine videotaped. On one occasion Robinzine gave M.K. marijuana laced with cocaine, which they smoked together.

During June of that year, Robinzine offered to take M.K. on a trip to the Wisconsin Dells over the Fourth of July weekend. M.K. showed up at Robinzine's home on Friday, July 2, 1993 with her bag packed for a weekend at the Dells. She wore casual clothes and tennis shoes and brought shorts, t-shirts, and a swimming suit for the trip. They planned to stay at Robinzine's home that night and leave the next morning. The next morning, however, Robinzine told M.K. that she was not going to wear the "tomboy clothes" she had packed. He dumped the bag she had brought, packed a different bag of clothes for her, and told her to put on a red mini-skirt, a short top, and black pumps instead, which she did. Robinzine then put the bag he had packed for M.K. in his car—leaving her other clothes and bringing nothing for himself—and they left. They made one stop for an oil change and then another stop to pick up some Wisconsin Dells brochures.

M.K. fell asleep for a few hours while Robinzine drove. When she woke up she was surprised to see signs and toll booths indicating that they were headed to Chicago. When M.K. asked why they were driving toward Chicago, Robinzine told her, for the first time, that they were going to visit his cousin in Chicago and would go to Wisconsin Dells the next day. When they arrived in Chicago, Robinzine stopped at a gas station to call his cousin. They waited at the station until Robinzine's cousin arrived in a white Blazer, along with a woman and three children. Robinzine and M.K. then set off, following the Blazer, in search of a hotel. They eventually ended up at the Blackstone in downtown Chicago. They checked into Room 1103 as "Mr. and Mrs. Carey Robinzine."

Later that evening, while Robinzine was making a phone call, M.K. went down to the lobby to get dinner for the two of them. Phone records for their room reveal that a call was made to a local number at 8:36 p.m. When M.K. brought the food back up to the room, they ate, and then she fell asleep. Another call was made to the same local

1. Section 2423(a) also prohibits knowingly transporting a person under age 18 interstate with the intent that the minor engage in "any sexual activity for which any person can be charged with a criminal offense." Under Illinois law, it is a crime to have sex with a person between the ages of 13 and 17 if the accused is at least five years older than the victim. 720 ILCS 5/12–16(d). Robinzine's single-count indictment charged that he transported the minor victim both for prostitution purposes and for sexual activity that is criminal under Illinois law. The court properly charged the jury that they could convict on either or both theories, as long as they were unanimous on at least one theory. The jury returned a general verdict of guilty. Robinzine does not challenge the sufficiency of the evidence for either theory, and we find the evidence sufficient to sustain the conviction on both theories. Because the focus of the trial and the challenges on appeal relate to the prostitution theory, we discuss only this aspect of the charge.

number at 11:12 p.m. Sometime after midnight, M.K. awoke to the sound of Robinzine on the telephone. When he hung up, Robinzine instructed her to call a particular telephone number—the same local number called twice earlier—and ask for "Christy." Phone records show this call was made at 1:18 a.m., the morning of July 4. When M.K. did so, she spoke to "Christy," who told her to write down the following information: "Damon Buford, Westin, 943–7200, California, 1031, $200." M.K. wrote the information down on a scrap of paper and hung up the phone. She realized that the call was about "sex for money," and she immediately told Robinzine that she wasn't going to do it. Robinzine told her that she was going to do it and started screaming and swearing at her. He called her a "bitch" and a "skankhole" and told her she was "born to be a prostitute."

M.K. started crying and told him repeatedly that she was not going to do it. Robinzine then got out the clothes he had packed for her—a revealing black dress and highheeled pumps—and demanded that she put them on. After she put on the dress, Robinzine ordered her to go downstairs and call a taxi. When M.K. refused, he slapped her four times across the face. She cried harder and pleaded with him, asking why he was doing this to her. He responded by cursing at her and ordering her to take off the dress she had put on, saying that she was not going to ruin his stuff. He told her that she couldn't wear anything of his and then forced her to sit naked by the air conditioner, which he turned to cold. Hours passed while M.K. sat naked and crying, too cold to sleep.

When she crawled to the bottom of the bed for warmth, Robinzine got up and slapped her across the face with the back of his hand. He again called her names, ordered her to get on the bed, and then grabbed her by the hair and forced her to perform oral sex. M.K. was so repulsed by the act that she ran to the bathroom and threw up repeatedly. M.K. then returned to the bed and waited until she thought Robinzine was asleep. At about 9:00 or 10:00 a.m. the morning of July 4, M.K. got out of bed and put on her leather jacket and tennis shoes—the only clothes that she had along belonging to her. Robinzine woke up and told her that he wasn't giving her a ride home and that if he did give her a ride, he would kill her and throw her body in a ditch. Not wanting to go into the lobby only partially dressed, M.K. pretended to leave and, at the last minute, grabbed the red outfit from the previous day, ran down the hall, got dressed in a stairwell, and then ran down five flights of stairs to the sixth floor, all the while afraid Robinzine was going to come after her. M.K. then took the elevator to the first floor and called 911 for the police.

Just after the police arrived and M.K. had begun telling them her story, Robinzine stepped out of the elevator. The officers arrested him, and as he was being led out of the hotel, Robinzine looked at M.K. and mouthed the words "I'm going to get you, bitch." Detective Adeline Raducha, a Chicago police officer who interviewed Robinzine on the day of the arrest, stated that Robinzine initially claimed that he thought M.K. was 18 years old, but admitted that he had "knocked her around a few times." Later that day Robinzine admitted to Raducha and a state's attorney that M.K. had told him she was 16 and that he had called his cousin's friend to arrange a "date" for M.K. while they were in Chicago. Raducha also testified that when she observed M.K. that day, M.K. had bruises on her arms.

The evidence presented at trial revealed that the phone number called three times the evening of July 3–4 was assigned to Christy Atkins, doing business as American Playhouse. The American Playhouse advertised in the yellow pages as an "escort service." Vakellye Lynn McCoy, who had been working for American Playhouse during July of 1993, testified that American Playhouse was actually engaged in the business of prostitution and that she had worked there as a prostitute. McCoy explained that the business was run by Christy Atkins and her husband Curtis Atkins, who was a cousin of Carey Robinzine. McCoy explained how the business was run, how calls from potential clients were handled, and how a price would be set for a "date" without ever actually mentioning the word "sex" on the phone.

McCoy testified that four women, including herself and Christy Atkins, were working as prostitutes for the American Playhouse during the summer of 1993. It also came out at trial that on June 25, 1993, approximately a week before Robinzine and M.K.'s trip to Chicago, a 30 minute call was made from the home of Carey Robinzine to the American Playhouse.

Damon Buford, a professional baseball player, testified that he was in Chicago the night of July 3, 1993, staying at the Westin Hotel in Room 1031. Sometime after midnight (the morning of July 4), he picked up the Yellow Pages and called four or five of the numbers from the escort section. Phone records reveal that one of these calls was to the American Playhouse and was placed at 12:44 a.m. Only two of the "services" called Buford back. When the first one called, Buford found the prices ($300–$500) too steep and refused. Then the second one called, and after Buford rejected the $300 and $400 prices, they struck a deal at $200. The service told Buford they would "send someone over," but no one ever came.

Vakellye McCoy also testified to an incident that occurred in early August 1993, after Robinzine had already been arrested in regard to the July 3–4 incidents in Chicago. McCoy returned from a prostitution "date" to the hotel room from which the American Playhouse was then conducting its business. Robinzine was in the room with Christy and Curtis Atkins. Curtis directed McCoy to give the Playhouse's share—one-half of the $150 she had just made—to Robinzine. So McCoy gave Robinzine $75. McCoy also testified to a conversation at this time in which Curtis asked if she would be interested in a Yellow Pages ad for $800, with the condition that Robinzine would be her pimp. McCoy

refused the offer. Finally, McCoy testified that when FBI agents contacted her in mid-August, she initially lied to them, saying that she had been paged in the early hours of July 4 to go to the Blackstone Hotel to pick someone up. She stated that Christy Atkins had told her to give this story, apparently in an attempt to make it appear that the "date" with Damon Buford was really for McCoy, not M.K.[2] McCoy testified that she initially told this story because she "thought [she] was helping out someone." Later, she told the FBI the truth: that she was not working that night and was not aware of the events at the Blackstone.[3]

Before trial the government filed a motion in limine to admit evidence concerning the relationship of Robinzine and M.K. prior to July 3, 1993, including evidence that they had once used marijuana and crack cocaine together, which Robinzine supplied. The government maintained that this evidence illustrated how Robinzine attempted to gain dominance and control over M.K. and his intent on July 3, 1993 to force her to be a prostitute.[4] Although Robinzine's counsel did not respond to the government's motion in limine, when the issue of marijuana use was raised at trial, Robinzine's counsel objected. After extended sidebar debate between the attorneys, and upon hearing the government's representation that M.K. would testify to a couple of occasions of drug use and a statement by Robinzine that he was going to get M.K. "hooked" on crack so she wouldn't leave him, the court decided to allow the inquiry. M.K. then testified that on one occasion she and Robinzine had used marijuana laced with cocaine together. She stated that Robinzine told her that he was going to get her "hooked on crack" so she

2. During opening arguments defense counsel suggested that the Damon Buford message taken by M.K. was intended for McCoy, who was paged by Christy Atkins that night and was allegedly supposed to pick up Robinzine and M.K. at the Blackstone.

3. Phone records show that McCoy was paged only once by the American Playhouse on the evening of July 3, 1993. She was paged at 10:48 p.m., i.e., over two hours before the call even came in from Damon Buford, so the page could not possibly have been about Damon Buford.

4. In this regard, the government also intended to introduce evidence that on one occasion Robinzine showed M.K. a gun and told her that he would kill her if she ever left him. Although Robinzine's attorney never responded to the government's motion in limine to introduce this gun evidence, he objected when the gun incident was raised at trial. Upon noting that there was no allegation of a gun being around the weekend of July 3, the court disallowed the testimony. The gun episode was not mentioned again.

would "keep coming back" to him. M.K. testified that she thought he was being sarcastic at the time. Just before closing arguments began, however, the court reversed itself, sua sponte, and struck M.K.'s testimony about the drug use.[5] In the jury charge the court again instructed the jury to disregard any evidence to which it had sustained an objection or that it had ordered stricken.

## II.

◼ Robinzine appeals his conviction on the basis of 1) the drug use testimony heard by the jury and 2) various elements of the testimony of Vakellye McCoy.[6] The government argues, at length, that the drug use testimony was intricately related to the crime and was properly admissible as evidence of Robinzine's intent to gain control over M.K. and to force her into prostitution when they left Minnesota on July 3, 1993.[7] We need not and do not choose to go this far. The relevance of a single incident of drug use to the events of July 3 and 4 is questionable, and any probative value may well be substantially outweighed by the potential for unfair prejudice. FED. R. EVID. 403. The government has never claimed that M.K. was addicted to drugs, established any other drug exchanges between the two, or alleged any drug use on the night in question.

The situation in *United States v. Hattaway*, 740 F.2d 1419 (7th Cir.), *cert. denied*, 469 U.S. 1028, 105 S.Ct. 448, 83 L.Ed.2d 373 and 469 U.S. 1089, 105 S.Ct. 599, 83 L.Ed.2d 708 (1984), where we upheld the admission of "lifestyle" evidence in a Mann Act conviction,

was entirely different. *Hattaway* was a kidnapping case in which we recognized that evidence about drug use, sexual activity, and intimidation was relevant to providing an accurate description of the victim's ordeal. *Id.* at 1425. Furthermore, in *Hattaway,* the evidence of drug and alcohol use "helped substantiate the government's claim that the defendants used psychological control to keep [the victim] with them" during the period of the kidnapping. *Id.* In this case, however, the single alleged incident of drug use did not even occur during the commission of the offense, and the evidence of "psychological control" prior to the weekend in July 1993 was minimal at best.

But even if the drug evidence was initially admitted improperly, any error was fully cured by the court's striking of this evidence and instructions to the jury to disregard the stricken testimony. *See United States v. Dietrich*, 854 F.2d 1056, 1059 (7th Cir.1988) (citing *Opper v. United States*, 348 U.S. 84, 95, 75 S.Ct. 158, 165, 99 L.Ed. 101 (1954)). The evidence of Robinzine's guilt was overwhelming, and we are convinced that M.K.'s testimony about a single incident of drug use, later struck by the court, had no effect on the jury's verdict.

◼ Vakellye McCoy's testimony about how American Playhouse operated its prostitution business was not objected to at trial. Thus we review the admission of this testimony only for plain error. *United States v. Sandoval–Curiel*, 50 F.3d 1389, 1392 (7th Cir.1995). McCoy's testimony about how the

5. The court said the following to the jury:

> Before we start the closing arguments, I should say one thing to you. There was briefly some testimony about smoking some marijuana with some crack in it at one point during the relationship. Given the fact that that's not what the charge is all about and it really has very little relevance to what the charges are all about, I am going to strike that testimony. So you can just disregard that.

6. Robinzine's brief on appeal lumps all of his evidentiary challenges together, does not articulate with clarity why the challenged evidence was improperly admitted, and advances no relevant legal authority. Thus, we could properly conclude that the claims are waived altogether. *United States v. Dunkel*, 927 F.2d 955, 956 (7th

Cir.1991) (citing *United States v. Giovannetti*, 919 F.2d 1223, 1230 (7th Cir.1990)). The only evidentiary rule even referenced is Rule 404(b), which prohibits admitting character/bad act evidence in order to show action in conformity therewith. FED. R. EVID. 404(b). Yet Robinzine provides no argument as to why the challenged evidence came in as character evidence, rather than coming in for a proper purpose; and we find that the evidence admitted was clearly not improper character evidence. In the interest of fairly considering Robinzine's appeal, however, we construe his brief expansively and address claims merely alluded to therein.

7. The government refers in its brief to the drug use showing a "pattern of enticing and controlling M.K." By definition, one instance cannot show a "pattern."

prostitution business operated was necessary to establish that American Playhouse was indeed a front for prostitution and to demonstrate that M.K.'s telephone conversation with "Christy" was about prostitution, though the word was not actually mentioned. The testimony was highly probative and not unfairly prejudicial. Therefore, the admission of this testimony was not plain error. In addition, the evidence of the phone call from Robinzine's home to the American Playhouse was properly admitted and was not objected to by the defendant at trial.[8]

■ Robinzine also objects to McCoy's testimony explaining why she initially lied to the FBI about being paged during the early hours of July 4 to go to the Blackstone Hotel to pick someone up, only later admitting that this story was made up at the request of Christy Atkins. This testimony was properly admitted during the government's case in chief. During the defendant's opening argument, Robinzine's counsel stated that the information about the prostitution "date" with Damon Buford was intended for Vakellye McCoy, not M.K. At an on-the-record sidebar before McCoy's testimony, Robinzine's counsel indicated his intent to elicit from McCoy her initial statement to the FBI, in order to support the defense's theory that the phone call regarding Buford was really for McCoy. Upon this representation, the court allowed the government to "front" this initial statement by McCoy with her later recantation and explanation.

■ Robinzine asserts that McCoy's testimony, regarding the request from Christy Atkins to make up a story indicating that the Buford "date" was really for her, was inadmissible hearsay. Yet this testimony does not even fit the definition of hearsay, since it was not offered to prove the truth of the matter asserted, i.e., the truth of Atkins's words to McCoy. FED. R. EVID. 801(c). In fact, the statement by Atkins was not even a factual one; it was a request or an order that did not actually assert anything. It could not be hearsay, since it made no

assertion of fact that could be true or false. Rather, the significance of the words was *that* they were said (i.e., that a "verbal act" occurred) and how they affected McCoy, not the truth-value of what was said. Thus the testimony was offered, and properly admitted, to explain why McCoy made statements to the FBI that she now maintains were false. *See Lee v. McCaughtry,* 892 F.2d 1318, 1325 (7th Cir.) (statements offered to explain why defendant changed his story not hearsay), *cert. denied,* 497 U.S. 1006, 110 S.Ct. 3244, 111 L.Ed.2d 754 (1990) and 502 U.S. 895, 112 S.Ct. 265, 116 L.Ed.2d 218 (1991); *United States v. Payne,* 944 F.2d 1458, 1472 (9th Cir.1991) (statements offered to explain circumstances under which witness made earlier false statement not hearsay), *cert. denied,* 503 U.S. 975, 112 S.Ct. 1598, 118 L.Ed.2d 313 (1992). The district court did not err in allowing the government to elicit from McCoy, during direct examination, non-hearsay testimony explaining why she initially lied to the FBI.

### III.

■ Robinzine also challenges the two-point enhancement in his sentence for obstruction of justice. The Sentencing Guidelines provide as follows: "If the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense, increase the offense level by 2 levels." U.S.S.G. § 3C1.1. At the conclusion of Robinzine's sentencing hearing, the court announced that it was imposing the two-point enhancement for obstruction of justice. The court noted that there was obstruction at the time of the arrest and later when Robinzine attempted to keep M.K. from testifying against him. The court stated, "I don't have any doubt in my mind that the defendant was very much involved in trying [to] orchestrate a way in which to avoid a conviction."

■ We will uphold the enhancement for obstruction of justice unless it is clearly erro-

---

8. Robinzine refers in his brief to the erroneous admission of evidence about his "relationship" or "association" with a prostitute. Lacking any explanation or elaboration of this challenge in

Robinzine's brief, we interpret it as referring to the phone call from Robinzine to the American Playhouse.

neous. *United States v. Johnson*, 46 F.3d 636, 638 (7th Cir.1995). At trial, M.K. testified that when the police arrested Robinzine at the Blackstone Hotel, he looked at her and mouthed the words "I'm going to get you bitch." During the sentencing hearing, M.K. testified that Andre Halliburton, a friend of Robinzine, told M.K. that Robinzine would give her $3000 if she would keep her mouth shut about the events in Chicago. She also testified that Halliburton related to her that if she didn't take the bribe and "plead the Fifth," "there would be a price on [her] head." M.K. stated that the threat scared her. The sentencing court also had before it evidence of a recorded conversation in which Robinzine, while still incarcerated and prior to the contact from Halliburton, discussed bribing M.K. with Curtis Atkins. Thus there was ample evidence demonstrating that Robinzine did attempt to obstruct the administration of justice during the investigation and prosecution of the charge against him.

Robinzine incorrectly assumes that because a subsequent attempt by the FBI to further corroborate the obstruction failed, the preceding evidence of obstruction was completely negated. After learning of the bribe and threat relayed by Halliburton, the FBI recorded a telephone conversation between Robinzine and M.K. Robinzine did not attempt to threaten or bribe M.K. during this particular conversation. M.K. testified that she thought Robinzine might have known that the phone conversation was being taped. This is certainly possible. Ultimately, the fact that Robinzine did not threaten to obstruct justice during one particular phone conversation does not erase his earlier attempts, nor does it make the court's two-point enhancement for obstruction clearly erroneous.

■ Finally, Robinzine argues that it was unconstitutional for the government to pursue the obstruction of justice enhancement under the Sentencing Guidelines, rather than charging Robinzine with obstruction of justice as a separate, substantive offense—which would have entitled him to additional constitutional protections not required at sentencing (such as the right to trial and a right not to have hearsay used against him).

Robinzine's only support for this argument comes from dicta statements of a single judge sitting by designation in this circuit. *See United States v. Haddad*, 10 F.3d 1252, 1262 n. 2 (7th Cir.1993) (opinion by Eisele, J. of the Eastern District of Arkansas). This circuit, however, has consistently upheld the constitutionality of the government choosing the Guidelines enhancement approach over the separate charge approach. *See, e.g., United States v. Corbin*, 998 F.2d 1377, 1382–85 (7th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1124, 127 L.Ed.2d 432 (1994); *United States v. Mason*, 974 F.2d 897, 898–900 (7th Cir.1992). In *Corbin* we provided an extensive explanation of why such enhancements are allowable, though they may have the appearance of unfairness, noting that the enhancements serve to appropriately reflect the gravity of the circumstances surrounding the indicted offense—gravity that prior to the Sentencing Guidelines could have been reflected through the exercise of a court's sentencing discretion. 998 F.2d at 1382–85. In addition, we have consistently held that a defendant can be sentenced on the basis of hearsay, *see, e.g., United States v. Badger*, 983 F.2d 1443, 1459 (7th Cir.) ("Hearsay is an integral part of the sentencing process . . . ."), *cert. denied*, 508 U.S. 928, 113 S.Ct. 2391, 124 L.Ed.2d 293 and —— U.S. ——, 114 S.Ct. 76, 126 L.Ed.2d 44 (1993), and that factual determinations at sentencing need not be proven beyond a reasonable doubt. *See id.*; *United States v. Curry*, 977 F.2d 1042, 1059 (7th Cir.1992), *cert. denied*, 507 U.S. 947, 113 S.Ct. 1357, 122 L.Ed.2d 737 (1993); *United States v. Reynolds*, 900 F.2d 1000, 1003 (7th Cir.1990) (citing *Patterson v. New York*, 432 U.S. 197, 207, 97 S.Ct. 2319, 2325–26, 53 L.Ed.2d 281 (1977)).

For the foregoing reasons, Robinzine's conviction and sentence are AFFIRMED.