UNITED STATES of America, Appellee,

v.

Julio OLIVERAS, Defendant–Appellant.

No. 657, Docket 89–1380.

United States Court of Appeals, Second Circuit.

Argued Feb. 1, 1990.

Decided June 4, 1990.

Don D. Buchwald, New York City (James M. Keneally, of counsel), for defendant-appellant.

Jeh C. Johnson, Asst. U.S. Atty., S.D. N.Y. (Otto G. Obermaier, U.S. Atty., David E. Brodsky, Asst. U.S. Atty., of counsel), for appellee.

Before OAKES, Chief Judge, KEARSE, Circuit Judge, and FLETCHER, Circuit Judge.[*]

PER CURIAM:

## BACKGROUND

Julio Oliveras and his girlfriend, Lillian Acosta, were arrested on January 25, 1989 for selling PCP to an undercover police officer in the Bronx. The arrest was made as part of a "federal day"[1] sweep carried out by New York City police. According to the complaint, undercover officers approached Oliveras and Acosta and asked Oliveras for two bags of PCP. After making proper change for the $14 sale, Oliver-

as delivered the drugs. Oliveras and Acosta were arrested several minutes later. The arresting officers alleged that as they approached Oliveras, they observed him drop eight additional bags of PCP from his pocket. Oliveras contended that he was one of two dozen people arrested in the sweep at the same time in the same location, all of whom were placed up against a wall. One of the others arrested, according to Oliveras, must have thrown down the eight PCP bags.

A grand jury indicted Oliveras and Acosta on February 17, 1989. Count One charged Oliveras and Acosta with selling two bags of PCP within one thousand feet of a school in violation of 18 U.S.C. § 2 and 21 U.S.C. §§ 812, 841(a)(1), 841(b)(1)(D), and 845a(a). Count Two of the original indictment charged Oliveras and Acosta with possessing with intent to distribute eight bags of PCP in violation of 18 U.S.C. § 2 and 21 U.S.C. §§ 812, 841(a)(1) and 841(b)(1)(D).

During plea discussions, Oliveras' counsel advised the prosecutor that Oliveras admitted having sold the two bags of PCP, but denied having possessed and then dropped the other eight on the sidewalk. The Government proposed dropping Count Two of the indictment (the possession of eight bags) in return for Oliveras' guilty plea to Count One (the distribution of two bags) and his admission, in his plea allocution, to the possession of the eight additional bags. Maintaining he had not possessed those eight bags, Oliveras refused the government's offer.[2]

The government then offered to allow Oliveras to plead guilty to Count One of the Superseding Information, charging him with the sale of two PCP bags within one thousand feet of a school. This new proposal did not require Oliveras to admit to having possessed the eight bags, which

---

[*] Of the United States Court of Appeals for the Ninth Circuit, sitting by designation.

[1.] On these days, suspects arrested on drug offenses that constitute federal crimes are turned over to federal authorities for charge and prosecution.

[2.] The government points out that even Oliveras' counsel characterizes the evidence of possession as "persuasive." Oliveras observes that he had no incentive to lie because under the Sentencing Guidelines his base offense level would be the same whether it was calculated for only the two bags or for ten.

Oliveras persisted in denying. Oliveras accepted the offer, and on April 25, 1989 entered his guilty plea.

Following his guilty plea, Oliveras was interviewed by a probation officer for the purpose of preparing the presentence report. Oliveras continued to deny having possessed the eight bags of PCP, but admitted selling the two and acknowledged that he had a drug problem. The probation officer recommended that Oliveras not receive the two-point reduction of the offense level under § 3E1.1 of the Sentencing Guidelines for "Acceptance of Responsibility," which provides for a reduction in the offense level if the defendant clearly demonstrates a recognition and acceptance of personal responsibility for his criminal conduct. The probation officer's recommendation was based on the fact that Oliveras'

> statement concerning the instant offense is limited to the sale itself and does not address relevant conduct, i.e., the possession of the additional 8 bags of PCP. In addition, his explanation for his behavior, namely needing money for [video] tapes, is not credible given the fact that he apparently had $70.00 with which he purchased the PCP he was planning on selling.

Probation Report at p. 3. The probation report also quoted from a prior presentence report on Oliveras, which stated that Oliveras "does not appear to recognize the seriousness of the offense and shifts the blame onto his accomplices.... He feels that he was framed."

During the sentencing hearing, defense counsel sought the two-point reduction under § 3E1.1.[3] Defense argued that Oliveras had accepted responsibility for selling the two bags of PCP and had come to grips with his drug problem, as evidenced not only by his admission of use, but also by his voluntary surrender to begin his prison term immediately even though the prosecution had consented to his release through the sentencing date. Although frankly acknowledging the impossibility of accurately predicting if a given individual will succeed in ridding himself of a drug problem that is at the root of his criminal conduct, defense counsel advised that Oliveras' situation presented some genuine room for hope since his former employer had offered to take him back after release from prison and Oliveras seemed committed to raising the child that Ms. Acosta was to have. Further, defense argued that it would be improper to predicate a refusal to credit Oliveras with acceptance of responsibility on his denial of possessing the eight PCP bags. The defense urged the court to follow *United States v. Perez–Franco*, 873 F.2d 455 (1st Cir.1989), which held that acceptance of responsibility should be assessed solely with respect to the actual charge to which a defendant pleads guilty, and not to those counts which were dismissed as part of a plea agreement. The Government argued that the court should reject *Perez–Franco*, and, in any event, should deny the two-point reduction because Oliveras had not accepted responsibility even for the conduct to which he had pled guilty.

The district court explicitly declined to follow *Perez–Franco*. Finding Oliveras' acceptance of responsibility to be "selective," the judge denied the two-point reduction.

> I again say I think he [Oliveras] is selective to the extent he is willing to concede both his problem with use of drugs, and also with the extent of his involvement...."
>
> You haven't been candid with the probation officer and you haven't been candid with the prosecutor and apparently you haven't been candid with your lawyer.... Based on the very convincing and thorough letter presented to the court by the government ..., which convinces me that you should not get credit for acceptance of responsibility for a selective admission of what your involvement is, and the fact you took eight glassine envelopes out of your pocket

---

**3.** With the reduction, the sentencing range would have been 18–24 months; without, it was 24–30 months.

and dropped them on the ground doesn't mean you should have continued to avoid fessing up, admitting what the situation was.

The judge sentenced Oliveras to 30 months' imprisonment. Oliveras timely appeals from that sentence.

## DISCUSSION

In recognition of "legitimate societal interests," the Sentencing Guidelines provide for a lesser sentence to a defendant who has demonstrated sincere remorse in a timely fashion. Section 3E1.1, Background, Sentencing Guidelines. Section 3E1.1(a) instructs as follows:

> If the defendant clearly demonstrates a recognition and affirmative acceptance of personal responsibility for his criminal conduct, reduce the offense level by 2 levels.

### I

*Requiring the Assumption of Responsibility for Crimes not Pled Violates the Fifth Amendment*

 Oliveras argues that to read this statute as requiring him to accept responsibility other than for the count to which he pled guilty would violate his fifth amendment right to refuse to incriminate himself, and that the sentencing judge erred in basing the denial of the credit on his refusal to admit possession of the eight bags. We agree. So long as the defendant's statements are not immunized against use in subsequent criminal prosecutions, the ef-

fect of requiring a defendant to accept responsibility for crimes other than those to which he pled guilty or of which he has been found guilty is to penalize him for refusing to incriminate himself. This runs afoul of the fifth amendment.

Just because the government has agreed to dismiss counts does not remove the risk of self-incrimination posed by admissions made by a defendant to a probation officer concerning crimes to which he is not pleading guilty. As the *Perez-Franco* court observed, a plea bargain can "unravel at any time for any number of reasons," [4] and some statements made by a defendant during plea negotiations may be admissible in other litigation. 873 F.2d at 460. In interpreting the contours of the fifth amendment, the Supreme Court has made clear that the "amendment not only protects the individual against being involuntarily called as a witness against himself in a criminal prosecution, but also privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings ... unless and until he is protected at least against the use of his compelled answers." *Lefkowitz v. Turley*, 414 U.S. 70, 77–78, 94 S.Ct. 316, 322, 38 L.Ed.2d 274 (1983). As a necessary corollary, the Court has warned that the government cannot impose penalties because a person has elected to assert his constitutional right not to make statements that would incriminate him.[5] *Minnesota v. Murphy*, 465 U.S. 420,

---

4. Even if the defendant postpones making an admission until his sentencing hearing, after the plea is entered, to do so leaves little real opportunity to earn the acknowledgment of responsibility credit, since timeliness of the acknowledgment is a factor in assessing its sincerity. *Guidelines*, § 3E1.1, Application Notes, 1(g).

5. The government argues that Oliveras never asserted his fifth amendment privilege, but rather, "waived" it by falsely claiming to the probation officer that he never possessed the bags. There is no merit to this contention. First of all, as the Supreme Court noted in *Minnesota v. Murphy*, 465 U.S. 420, 427–28, 104 S.Ct. 1136, 1142, 79 L.Ed.2d 409 (1983), although "witnesses who failed to claim the privilege were once said to have 'waived' it," the court has aban-

doned this "vague term," preferring instead to focus the analysis on whether a particular disclosure that subsequently is used against the defendant was "compelled" within the meaning of the fifth amendment.

Second, Oliveras' situation was such that he was not required to assert his fifth amendment privilege explicitly. It is true that the fifth amendment privilege is not "self-executing." As a general rule, if it is not asserted, any inculpatory statements made by the defendant are deemed not to have been compelled and therefore may be used against him. The reasoning is that if, after having been notified of his fifth amendment right, a defendant chooses to answer, "his choice is considered to be voluntary since he was free to claim the privilege and would suffer no penalty as the result of his

104 S.Ct. 1136, 79 L.Ed.2d 409 (1983) (although it is clear that a state may not constitutionally carry out a threat to revoke probation for the legitimate exercise of the fifth amendment privilege, Murphy's fifth amendment rights were not violated because the Minnesota probation revocation statute did *not* require him to choose between making incriminating statements and jeopardizing his conditional liberty by remaining silent; there was no suggestion by the state that probation was conditional on the waiver of his fifth amendment privilege); *Lefkowitz v. Cunningham,* 431 U.S. 801, 805, 97 S.Ct. 2132, 2135, 53 L.Ed.2d 1 (1977) (finding unconstitutional a New York statute providing that if a political party officer who is subpoenaed by a grand jury to testify concerning the conduct of his office refuses to testify or to waive immunity, his term of office will terminate; "when a State compels testimony by threatening to inflict potent sanctions unless the constitutional privilege is surrendered, the testimony is obtained in violation of the fifth amendment and cannot be used against the declarant in a subsequent criminal prosecution."); *Lefkowitz v. Turley,*

414 U.S. 70, 94 S.Ct. 316, 38 L.Ed.2d 274 (1973) (finding unconstitutional New York statutes requiring public contractors to waive immunity and to testify concerning their state contracts upon penalty of loss of current and future contracts); *Uniformed Sanitation Men v. Sanitation Comm'n,* 392 U.S. 280, 284, 88 S.Ct. 1917, 1919, 20 L.Ed.2d 1089 (1968) (where public employees were told that their refusal to answer questions and sign waivers of immunity for an official interrogation would lead to their dismissal, Court held that this choice between "surrendering their constitutional rights or their jobs" violated the fifth amendment); *Garner v. Broderick,* 392 U.S. 273, 88 S.Ct. 1913, 20 L.Ed.2d 1082 (1968) (same).[6]

The government argues that the position it urges does not penalize a defendant for refusing to admit related conduct; it simply withholds a benefit to which the defendant is not automatically entitled. Courts squarely have rejected such a simple dichotomy. This distinction invokes the unconstitutional conditions doctrine. Although the doctrine is currently under sharp academic fire,[7] even its critics ac-

---

decision to do so." *Murphy,* 465 U.S. at 429, 104 S.Ct. at 1143 (1983). Not surprisingly, there are certain well-defined exceptions to the general rule requiring assertion of the privilege, one of which applies where the "assertion of the privilege is penalized so as to 'foreclos[e] a free choice to remain silent, and ... compe[l] ... incriminating testimony.'" *Murphy,* 465 U.S. at 434, 104 S.Ct. at 1145–46 (quoting *Garner v. United States,* 424 U.S. 648, 661, 96 S.Ct. 1178, 1186, 47 L.Ed.2d 370 (1976). In *Murphy,* the Court observed that if the State, either expressly or by implication, had asserted that "invocation of the privilege would lead to revocation of probation, it would have created the classic penalty situation, the failure to assert the privilege would be excused, and the probationer's answers would be deemed compelled and inadmissible in a criminal prosecution." The present case falls squarely within the penalty exception.

6. We note that the Court has held that the Constitution does not prohibit the government from compelling testimony if the person testifying is immunized from subsequent use of his testimony in criminal proceedings. *See, e.g., Minnesota v. Murphy,* 465 U.S. 420, 435–36 n. 7, 104 S.Ct. 1136, 1146 n. 7 ("... a State may validly insist on answers to even incriminating questions and hence sensibly administer its probation system as long as it recognizes that the required answers may not be used in a criminal proceeding

and thus eliminates the threat of incrimination.") *See also Lefkowitz v. Cunningham,* 431 U.S. 801, 805–06, 97 S.Ct. 2132, 2135–36, 53 L.Ed.2d 1 (1977) and *Lefkowitz v. Turley,* 414 U.S. 70, 84, 94 S.Ct. 316, 325, 38 L.Ed.2d 274 (1973) ("Although due regard for the Fifth Amendment forbids the State to compel incriminating answers from its employees and contractors that may be used against them in criminal proceedings, the Constitution permits that very testimony to be compelled if neither it nor its fruits are available for such use."), and *Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (United States can compel testimony from unwilling witness by conferring "use immunity," as opposed to the broader "transactional immunity").

7. The doctrine developed in response to the recognition that the traditional conception of negative rights as freedom from coercive violence has questionable value in shaping constitutional restraints on a government that more often exerts its power by withholding benefits than by threatening bodily harm. Kreimer, "Allocational Sanctions: The Problem of Negative Rights in a Positive State," 132 U.Pa.L.Rev. 1291 (1984). The key proposition of the unconstitutional condition doctrine is that the government may not do indirectly what it cannot do directly. The

knowledge that the distinction between government threats of penalty and denial of government benefits does not answer the question.[8] As one critic sensibly observes, analysis must focus not on the distinction between a penalty and a benefit, but instead on the nature of the right at stake.[9] To appreciate the flaw in the government's argument, one need only consider the ready response the court would have to a government proposal that, while it acknowledged a criminal defendant's constitutional right to be represented by an attorney, would offer a reduction in any later sentencing in return for the defendant agreeing to surrender his right to counsel. It could be argued that there is no valid state interest in requiring a defendant to give up his right to an attorney, while there may be a legitimate interest in obtaining admissions of responsibility from defendants for criminal conduct other than that included in the plea bargain. However, as the Court reiterated in *Lefkowitz v. Cunningham*, 431 U.S. at 808, 97 S.Ct. at 2137, citizens may not be forced to incriminate themselves merely because it serves a governmental need.

To require a defendant to accept responsibility for crimes other than those to which he has pled guilty or of which he has been found guilty in effect forces defendants to choose between incriminating themselves as to conduct for which they have not been immunized or forfeiting substantial reductions in their sentences to which they would otherwise be entitled to consideration. As the First Circuit concluded in *Perez–Franco*, "[c]learly, a defendant does not have a 'free choice to admit, to deny, or to refuse to answer' if he knows he will be incarcerated for a longer period of time if he does not make the incriminating statements. The touchstone of the fifth amendment is compulsion, and the Supreme Court has recognized that imprisonment is one of a wide variety of penalties which can serve to trigger a constitutional violation." *Id.* at 463, quoting *Cunningham*, 431 U.S. 801, 806, 97 S.Ct. 2132, 2136, 53 L.Ed.2d 1 (1977).

## II

*Section 3E1.1, Properly Interpreted and Applied, Is Constitutional.*

■ We do not interpret the Sentencing Guidelines as predicating the award of § 3E1.1 credit on the defendant's accepting responsibility for criminal conduct included

Supreme Court has articulated this proposition in the context of holding that the government may not grant even a gratuitous benefit on condition that the beneficiary relinquish a constitutional right. Some academic critics have pointed to the inconsistencies in the Supreme Court's treatment of the doctrine and the failure of the theory to distinguish in a principled way the pattern of holdings. *Compare, e.g., Nollan v. California Coastal Comm'n.,* 483 U.S. 825, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987) (state may not condition building permit on the property owner's grant of a public easement); *FCC v. League of Women Voters,* 468 U.S. 364, 104 S.Ct. 3106, 82 L.Ed.2d 278 (1984) (Congress may not forbid radio and television stations that accepted federal funds from the Corporation for Public Broadcasting to broadcast editorials); *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) (state unemployment compensation provision denying benefits to a Seventh Day Adventist who refused to work on Saturdays was unconstitutional); *with Grove City College v. Bell,* 465 U.S. 555, 104 S.Ct. 1211, 79 L.Ed.2d 516 (1984) (conditioning federal funds on nondiscrimination does not infringe first amendment rights); *Harris v. McRae,* 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980) (conditioning provi-

sion of medical services on the pregnant woman's choice not to exercise her right to have an abortion not unconstitutional); *Wyman v. James,* 400 U.S. 309, 91 S.Ct. 381, 27 L.Ed.2d 408 (1971) (conditioning welfare benefits on consent to home inspection by social worker is not unconstitutional). As one commentator has noted, at least the early unconstitutional condition cases "manifested an inconsistency so marked as to make a legal realist of almost any reader." Kreimer, "Allocational Sanctions," 132 U.Pa.L. Rev. 1293 (1984).

**8.** It may not even pose the proper question, because in most situations to even make the threshold identification of whether the government is imposing a penalty or denying a benefit requires the location of some baseline from which the action at issue may be measured. Sunstein, "Is There an Unconstitutional Conditions Doctrine?" 26 San Diego L.Rev. 337, 343 (1989); Sullivan, "Unconstitutional Conditions," 102 Harv.L.Rev. 1413 (1989).

**9.** Sunstein, "Is There an Unconstitutional Conditions Doctrine?" 26 San Diego L.Rev. 337 (1989).

in the counts dismissed by the government—an interpretation which would render the statute unconstitutional. Rather, we construe the statute as granting credit to a defendant who has been found to have accepted full responsibility for conduct included in those counts to which he has pled guilty.

In arguing that *Perez–Franco* was wrongly decided, the Government relies on a recent amendment to § 3E1.1 as well as on accompanying Commentary. Section 3E1.1(a) originally awarded a two-point reduction if the defendant accepted responsibility for "the offense of conviction." The provision was amended in 1988 to require defendants to accept responsibility for "criminal conduct." The government interprets this revision as reflecting the drafters' intent that defendants accept responsibility for more than just the counts to which they pled guilty or of which they were convicted at trial; "criminal conduct," they reason, must encompass more than the "offense of conviction." The Guidelines' Notes on Amendments does not support the government's interpretation. The drafters explain that the purpose of the amendment "is to clarify the guidelines." Guidelines Manual, November 1, 1989, C. 22. To accept the government's position—that "criminal conduct" refers to the offense of conviction and other relevant conduct—would effect a *change* rather than simply a *clarification.* We agree that "criminal conduct" is more encompassing than "offense of conviction," but we interpret this modification in language, adopted for the purpose of clarification, as removing an ambiguity as to whether the provision applies only to a defendant who has been tried and convicted of an offense or applies also to one who has pled guilty. By replacing "offense of conviction" with "criminal conduct" the Commission has clarified that it intended the provision to apply to the defendant who has pled guilty, as well as one convicted after trial: each must accept responsibility for all facets of the crime to which he either pled guilty or

of which he was convicted. As the *Perez–Franco* court observed, "There may have been clarifying reasons other than the ones discussed above, but we have been unable to think of any." 873 F.2d at 459.

The government also argues that the Guidelines Commentary (Application Note 1) requires that Oliveras accept responsibility for the additional eight PCP bags. We disagree. Application Note 1 lists seven factors to consider in determining whether a defendant qualifies for the credit, one of which is "[v]oluntary and truthful admission to authorities of involvement in the offense and related conduct." [10] The government argues that the possession of the eight bags is "related" to the distribution of the two and, therefore, should be included in Oliveras' admissions. In effect, they would have the court treat "related conduct" for purposes of Acceptance of Responsibility the same as "relevant conduct" elsewhere in the Guidelines.

Under the Guidelines' treatment of multi-level offenses, the eight PCP bags count as "relevant conduct" for the purpose of determining the initial base offense level. The Commentary to § 1B1.3 states

in a drug distribution case, quantities and types of drugs not specified in the count of conviction are to be included in determining the offense level if they were part of the same course of conduct or part of a common scheme or plan.

In other words, if under the Relevant Conduct section, a sentencing judge considered the additional eight bags to be part of the same course of conduct, i.e., "relevant conduct," Section 1B1.1 instructs the judge to aggregate the total amount of drugs involved in calculating the base offense level, which is one of the parameters that fixes the applicable sentencing range.

Throughout the Guidelines, the Commission used the term "relevant conduct," which becomes almost a term of art as a result of its detailed exposition in Sections 1B1.3 (Relevant Conduct), 4 (Criminal History); and 3D1.2(d) (Drug Trafficking). If

---

**10.** It is possible that the Commission meant this item, which was included in the list of examples of how acceptance can be manifested, to serve

as an indication of contrition rather than as grounds for inferring that the defendant's remorse was not sincere.

the Commission meant acceptance of responsibility to encompass "relevant conduct," it surely could have used that term; its failure to do so suggests that it was referring to something else.[11] *Cf. Russello v. United States,* 464 U.S. 16, 23, 104 S.Ct. 296, 300, 78 L.Ed.2d 17 (1983) (" '[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposefully in the disparate inclusion or exclusion' (citations omitted).... We refrain from concluding here that the differing language in the two subsections has the same meaning in each. We would not presume to ascribe this difference to a simple mistake in draftsmanship."). The Commission's inclusion for sentencing purposes of quantities of drugs charged in the indictment counts that the government later dismisses as part of plea bargain reflects a compromise between a "real offense" and a "charged offense" approach. A pure "charge offense" system would tie punishments directly to the offense for which the defendant was convicted. A "real offense" system bases punishment on the specific circumstances of the case and the defendant's actual conduct. *See* Guidelines Manual, 1.5–1.6; Breyer, "The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest," 17 Hofstra L.Rev., 1, 8–12. The Commission ultimately moved closer to a "charge offense" approach to sentencing, basing sentences upon the offense for which a defendant was charged and convicted. However, it is not a pure system, and one compromise was to use a "real offense" approach for a particular subset of crimes that includes drug trafficking. This represents a specific departure from the decision generally to calculate sentences according to the criminal conduct for which the defendant has been charged and convicted; the drafters have not said that the Acceptance of Responsibility section is part of this exception.

The interpretation we adopt does not render the "related conduct" phrase meaningless. Criminal conduct that relates directly to the pled count may be considered. For instance, in *United States v. Lanese,* 890 F.2d 1284, 1292–93 (2d Cir.1989) the court found that the defendant, who was convicted of using extortionate means to collect extensions of credit, had not accepted responsibility for his criminal conduct so as to justify the downward adjustment because he merely admitted his involvement in illegal gambling, and did not admit that he used extortionate means. *See also United States v. Tellez,* 882 F.2d 141 (5th Cir.1989) (§ 3E1.1 credit denied defendant who pled guilty to importing marijuana, in part because he never identified the persons who hired him to smuggle and never disclosed any significant fact relevant to the smuggling operation.) "Related conduct" could also encompass noncriminal conduct that is related to the pled count, for instance, if the defendant regularly associated with known drug dealers, but claimed merely to have stumbled unwittingly onto the drug scene, he could be found not to have accepted responsibility. Or past criminal conduct for which the defendant already had served a sentence but denied committing might constitute related conduct that a district court may consider if it is closely related to the present crime. For example, in *United States v. Spraggins,* 868 F.2d 1541 (11th Cir.1989), the sentencing judge denied § 3E1.1 credit even though the defendant admitted violating the statute prohibiting the distribution through the mail of materials depicting minors engaged in sexually explicit conduct. In rejecting the sincerity of the defendant's confession, the district court considered that the defendant had continued to molest hundreds of children after being released from a prior prison term following a conviction for a similar offense (assault upon a kindergarten student). We emphasize, however, that the refusal to accept responsibility for such past related criminal conduct could be considered only if the defendant was under no risk of subsequent criminal prosecution, for example, if the statute of limitations had run or if he had already served a sentence. Even if the drafters

---

**11.** In no other provision of the Guidelines is the term "related conduct" used.

*did* intend for "related conduct" to be synonymous with "relevant conduct," consideration necessarily would be limited to that criminal conduct for which the defendant is immunized from subsequent criminal prosecution.

Limiting acceptance of responsibility to pled or convicted counts does not lead ineluctably to credit for acceptance of responsibility, a link explicitly rejected by § 3E1.1(c), which states that "[a] defendant who enters a guilty plea is not entitled to a sentencing reduction under this section as a matter of right." If a defendant claimed that he was pleading guilty only to avoid the burden of going to trial, for instance, he would not be entitled to the two point reduction. In Oliveras' case, the probation officer contends his explanation for his behavior even as to the pled count lacked candor.

The government argues and the district court found *Perez–Franco* "contrary" to Second Circuit authority. We disagree. The cases upon which they rely are those determining what is "relevant conduct" under § 1B1.3 for the purpose of calculating the base offense level, *United States v. Bedoya,* 878 F.2d 73 (2d Cir.1989); *United States v. Fernandez,* 877 F.2d 1138 (2d Cir.1989); *United States v. Guerrero,* 863 F.2d 245 (2d Cir.1988), and holding that "relevant conduct" need be proved only by a preponderance of the evidence, *United States v. Guerra,* 888 F.2d 247 (2d Cir. 1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 1833, 108 L.Ed.2d 961 (1990).[12] What unadmitted conduct to impute to the defendant for the purpose of calculating the base offense level in drug cases simply is a different question from what conduct the defense must "accept responsibility" for in order to earn credit for acceptance of responsibility. Including "relevant conduct" in the first context may be harsh, considering it in the latter is Orwellian. To require, as a condition of earning the § 3E1.1 credit

that a defendant accept responsibility for behavior which he has continued to deny and has not been proved against him beyond a reasonable doubt raises distinct Fifth Amendment issues not present in the cited sentencing cases.

Other cases from our circuit that have affirmed the *denial* of the acceptance of responsibility credit did not address the issue we face today. They rested on deference to the sentencing judge's credibility determination that the defendant had not accepted responsibility for the crimes *of which he had been convicted.* In *United States v. Moskowitz (Moskowitz I),* 883 F.2d 1142, 1154–55 (2d Cir.1989), the defendant argued that the district court erred in denying him credit. Moskowitz and his three traveling companions, after an evening of freebasing cocaine, boarded an airplane for Miami loaded with a week's supply of butane canisters. Once on board, Moskowitz went to the lavatory to "cook up." He was caught, arrested, and the plane turned back to New York. Upon being advised of his right to remain silent, Moskowitz's response was to ask if the officers could give him a break and to query "does this mean I'm not going to Miami on vacation?" Moskowitz was tried by a jury under a six count indictment, and convicted of four counts (transporting hazardous materials in air commerce and possessing heroin and cocaine). Based on a two page affidavit purporting to be an acceptance of responsibility, Moskowitz sought the § 3E1.1 credit. We upheld the sentencing judge's denial, based on his skepticism regarding the sincerity of Moskowitz's narrowly tailored acceptance. In his statement, Moskowitz blamed his actions on his drug problem, insisting that he was now off drugs. Yet Moskowitz arrived at his trial carrying cocaine. Even after conviction, Moskowitz maintained the positions he had offered at trial to defend against those grounds; that he had not

---

12. In *Guerra* we applied pre-Guidelines caselaw governing due process requirements at sentencing hearings. Those cases held that due process does not require proof beyond a reasonable doubt of conduct for which the defendant has not been convicted. *McMillan v. Pennsylvania,* 477 U.S. 79, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986) (preponderance standard held to satisfy due process in state sentencing proceedings); *United States v. Fatico,* 603 F.2d 1053 (2d Cir.1979) (due process does not necessitate the reasonable doubt standard at federal sentencing hearings).

**632**

known that federal regulations prohibited carrying butane and nitrous oxide aboard the flight and he had not known his friends had brought canisters aboard the flight. A companion case, *United States v. Moskowitz*, 888 F.2d 223 (2d Cir.1989) (*Moskowitz II*), appealed the conviction of one of Moskowitz's cohorts, Jeffrey Toffler. His appeal did involve the denial of § 3E1.1 credit on the ground that the defendant had not acknowledged responsibility for conduct other than that of which he had been convicted. However, *Moskowitz II* did not address any fifth amendment issues.[13]

Similarly, although the fourth circuit rejected *Perez-Franco*, in *United States v. Gordon*, 895 F.2d 932 (4th Cir.1990), *Gordon* actually involved a defendant's refusal to accept responsibility for all the conduct involved in the *count of conviction*. The defendant alleged that to do so would render a successful appeal a hollow victory. The *Gordon* court stated that it followed the second circuit in adopting the position that to earn credit under § 3E1.1, a defendant must first accept responsibility for "all of his criminal conduct." *Gordon*, 895 at 936.[14] This mischaracterizes the holding of *Moskowitz II* as well as begs the question. *Perez-Franco* and this appeal face the question heretofore unresolved in this circuit: What counts as "criminal conduct" for the purposes of awarding credit for acceptance of responsibility.

CONCLUSION

We hold that a defendant cannot be denied the reduction in sentence provided by § 3E1.1 of the Sentencing Guidelines because he refused to make self-incriminating statements relating to conduct included in counts to which he had not pled guilty and which were dismissed as part of a plea agreement. The government and appellant dispute whether the district court refused

to grant the acknowledgment of responsibility credit on the independent, alternative ground that Oliveras was selective in his admissions even as to the count to which he pled guilty. The record is unclear on this point. Accordingly, we remand for resentencing.

---

13. The *Moskowitz II* opinion relied solely on *Moskowitz I,* and a Fifth Circuit decision, *United States v. Thomas,* 870 F.2d 174 (5th Cir.1989), a case which also involved only the district judge's credibility assessment of the defendant's acknowledgment of responsibility for conduct *involved in the counts of conviction.*

14. The *Gordon* court relied also on *United States v. Tellez,* 882 F.2d 141 (5th Cir.1989), but that case also involved a defendant who had been denied the § 3E1.1 credit because the district court found that he had not accepted responsibility for all the conduct involved in his *count of conviction.*