UNITED STATES of America,
Plaintiff–Appellee,

v.

Willie CORBIN, Jr., Defendant–Appellant.

No. 92–1459.

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 22, 1992.

Decided July 8, 1993.

ILANA DIAMOND ROVNER, Circuit Judge.

Willie Corbin, Jr., pled guilty to being a felon in possession of a firearm. After an evidentiary hearing, the district court found that Corbin had committed an aggravated assault while possessing the gun and calculated Corbin's sentence as if he had been convicted of that offense. Corbin contends that the district court erred in four ways: (1) in calculating the sentence, the court entertained evidence of a crime (aggravated assault) not charged in the indictment; (2) the court relied upon hearsay in finding that Corbin had committed an aggravated assault; (3) the court required only clear and convincing evidence of the aggravated assault rather than proof beyond a reasonable doubt; and (4) the court denied Corbin a two-level reduction for the acceptance of responsibility. We find none of these arguments to be meritorious and affirm.

## I. FACTS

On June 8, 1991, Corbin was arrested in possession of a .32 Smith & Wesson caliber Clerke 1st revolver in Kokomo, Indiana. A grand jury subsequently indicted Corbin, a convicted felon, on charges that he knowingly possessed a firearm that had moved in interstate commerce and that also had an obliterated serial number. *See* 18 U.S.C. §§ 922(g)(1), 922(k). Corbin elected to plead guilty to the felon-in-possession charge, and the government dropped the obliterated serial number charge.

On January 31, 1992, District Judge Sarah Evans Barker conducted both a plea and sentencing hearing.[1] After the government proffered the factual basis for Corbin's plea, Corbin acknowledged that he had been arrested in possession of the gun and that he had a prior felony conviction. (Tr. at 20–21.)[2] The district court accepted the guilty plea, finding that Corbin was competent to

Steven D. DeBrota, Office of the U.S. Atty., Indianapolis, IN, for plaintiff-appellee.

Patrick Stern, Indianapolis, IN, for defendant-appellant.

Before MANION and ROVNER, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

1. Corbin and the government entered into a plea agreement in early November of 1991. Corbin subsequently filed a petition to enter a plea of guilty, and the district court scheduled a change of plea and sentencing hearing. In the interim, the probation office prepared a presentence report and the parties filed briefs advancing their positions on the calculation of Corbin's sentence.

2. The transcript of the plea and sentencing hearing is cited throughout this opinion as "Tr. at ____."

offer a plea and that the plea was both knowing and voluntary. (*Id.* at 21–22.)

The focus of the proceeding then shifted to the circumstances surrounding Corbin's possession of the gun. In the presentence report, the probation officer had applied a cross-referencing provision of the guideline governing firearms offenses and calculated the sentencing range as if Corbin had been convicted of unlawful restraint. *See* United States Sentencing Commission, *Guidelines Manual,* § 2K2.1(c)(1)(A) (Nov. 1991).[3] The government agreed that Corbin's sentence should be calculated using the guideline governing unlawful restraint or, in the alternative, aggravated assault. Corbin argued that because he had pled guilty only to a felon-in-possession charge, he should be sentenced based on that offense alone. The district court concluded that cross-referencing was appropriate and allowed the parties to present evidence as to the circumstances that culminated in Corbin's arrest. (Tr. at 44.)

Corbin concedes that he had a gun in his possession when he was arrested on June 8, 1991.[4] Corbin also acknowledges that prior to the arrest, he had been in the company of Earl Davis, Rodney Killibrew, and Lanette Eason, whom he had once dated. Corbin maintains that all of them had been together drinking heavily since the night before, that he and Eason had used cocaine, and that

Killibrew had smoked marijuana. According to Corbin, the group ended up at Killibrew's apartment, where Corbin picked up a revolver that was laying about, waived it around for a while, and eventually left the apartment with the gun in his back pocket. Shortly thereafter, police officers arrived at the scene and arrested Corbin with the gun still in his pocket. The gun was not loaded, and Corbin describes it as "non-functional." He contends that Killibrew and Eason knew the gun was harmless. (Corbin Br. at 3.)

The government has portrayed a different scenario, which the district court credited after hearing the evidence. The government elicited testimony from three witnesses: Detective Sergeant David Mitchell and Lieutenant Thomas A. DiNardo of the Kokomo Police Department, and Agent B. David Gilbert of the Bureau of Alcohol, Tobacco and Firearms. In addition, the court admitted into evidence Eason's sworn statement.[5]

In her statement, Eason explained that she and Corbin had been romantically involved a year before the incident and had lived together briefly. Eason said she ultimately had broken off the relationship and that she had had difficulty with Corbin since that time.

Eason described the events of June 8, 1991 as follows. She had visited Killibrew's apartment to style his hair. Davis and Benny Pollard were there also. Corbin entered the

---

3. Unless otherwise indicated, we cite the November 1991 version of the Guidelines. The probation officer and the parties, however, seem to have used the November 1990 version in calculating Corbin's offense level. The district court presumably used the 1990 version as well, although the record is not entirely clear. We cite the 1991 version, which was in effect at the time Corbin was sentenced, because that is the version that Congress has required the sentencing court to apply. 18 U.S.C. § 3553(a)(4); *see also United States v. Schnell,* 982 F.2d 216, 218 (7th Cir.1992). The *Ex Post Facto* Clause of the Constitution may preclude the court from applying a particular Guideline provision that has come into effect after the offense of conviction if that provision results in a harsher penalty than the earlier version. *See United States v. Harris,* 994 F.2d 412, 416 n. 9 (7th Cir.1993). We do not confront that scenario here, however, as the particular provisions that the district court used in sentencing Corbin did not change between the 1990 and the 1991 version of the Guidelines.

We have noted this matter to emphasize the importance of probation officers, prosecutors, defense counsel, and district courts alike making explicit which version of the Sentencing Guidelines they have used in making their calculations. Doing so ensures that we all begin our analysis from the same starting point.

4. Corbin did not testify at the evidentiary hearing nor did he call any other witness with knowledge of what transpired on the night of his arrest. His account of what happened is instead set forth in his brief as well as the presentence report.

5. Detective Mitchell interviewed Eason on the evening of June 8, 1991, shortly after the events at issue in this case took place. A portion of that interview was recorded and then transcribed to serve as Eason's written statement. Eason read and signed the transcript on June 10, 1991.

apartment uninvited, pressed a gun against the corner of her eye, and demanded that she leave with him. Killibrew attempted to intervene, but Corbin warned him: "[M]an, I'll shoot you too." Eason was frightened, not knowing whether the gun was loaded, so she began to leave the apartment with Corbin. However, she was able to break away from him briefly when Killibrew and Corbin began to scuffle. Eason told Pollard to call the police, ran down the stairs of Killibrew's building, and tried to hide next to some bushes. However, Corbin caught up with her, telling her "[S]top girl, . . . I'm not going to hurt you I just want to talk to you" and "I just want my woman with me." Eason wanted "nothing to do with him." By this time, Corbin had the gun in his back pocket. It was at this point in the encounter that the police apparently arrived and arrested Corbin.

Lieutenant DiNardo recounted the following sequence of events. He and Sergeant Richard Nutt were driving in the area of Killibrew's apartment shortly before 5:00 p.m. on June 8 when Earl Davis came running from between several houses and flagged their car down. Davis was very agitated and told the officers, "You better get him before he kills someone!" Davis explained there had been a problem involving Corbin, indicated that Corbin had a gun, and pointed them in the direction of an apartment building where Corbin and the others remained. DiNardo and Nutt drove to that building. When they radioed in their location upon arrival, the police dispatcher informed them that someone else had also reported a disturbance at the same location.

The officers could hear screaming and yelling coming from the rear of the building as they approached, and they soon discovered four individuals—Corbin, Eason, Killibrew, and Larry Harrison [6]—in the midst of a verbal altercation. DiNardo ordered all four to place their hands against an adjacent wall, and when Corbin complied, DiNardo noticed a revolver protruding from his back pocket. Nutt took the gun from Corbin. He and DiNardo then searched everyone and attempted to determine what had happened.

Eason "was crying, somewhat disoriented, and appeared to be in an emotional state." DiNardo observed a "round reddened spot" near her left eye that he believed to be consistent with the caliber of the gun taken from Corbin. Eason informed DiNardo that "Willie Corbin had struck her in the face with a hand gun and then put the gun to her head. She stated that he told her that he would kill her if she didn't leave the apartment with him." Eason told DiNardo she had feared for her life. She agreed to be interviewed further at the police station.

Corbin, who was also in an emotional state, repeatedly interrupted DiNardo's interview with Eason and attempted to plead his case. When Nutt attempted to calm him down, Corbin became argumentative and Nutt arrested him.

DiNardo and another police officer also interviewed Killibrew briefly. DiNardo said he observed a red mark on Killibrew's face as well. Killibrew told DiNardo that he had fought with Corbin on a porch outside Killibrew's second-story apartment and that Corbin had struck him in the head with a gun during the fracas.

Detective Sergeant Mitchell interviewed Eason when she arrived at the police station. Like DiNardo, Mitchell noticed a small, circular, red swelling beneath her left eye that was about the size of a dime. Mitchell thought the mark was "somewhat consistent" with the size of a .32 caliber handgun. Mitchell explained that he interviewed Eason informally at first, but later took a formal statement from her that was recorded and eventually transcribed. Eason reviewed the transcribed statement with him two days later and signed it in his presence. Mitchell maintained that the statement accurately reflected what Eason had told him, and although he acknowledged that he and Eason had discussed some matters that were not included in the statement, Mitchell represented that nothing Eason had said to him was inconsistent with her statement. Mitchell also indicated that Eason never said anything suggesting that she believed Corbin's gun was defective.

---

6. The record does not disclose who Harrison is or what had happened to Pollard.

Although for the most part Mitchell did not recount the substance of his conversations with Eason, he was asked to describe two prior incidents involving Corbin and Eason. On direct examination, Mitchell testified that Eason told him she had run into Corbin on the street on the day before the June 8 incident. Corbin had brandished a gun and demanded that she sit with him. Eason said she felt compelled to sit and talk with Corbin for about an hour, until her mother happened to drive by and pick her up. On both cross- and redirect examination, Mitchell recounted a second incident that had occurred between three and eight weeks earlier. Eason said she had been sitting in a vehicle with a friend when Corbin threatened to remove her forcibly. Eason had responded by stabbing Corbin in the arm.

Mitchell had also interviewed Killibrew,[7] who said that Eason had been at his apartment giving him a permanent on June 8 when Corbin broke in, displayed a gun, and ordered Eason to leave with him. Killibrew said he had gotten into "somewhat of a wrestling match" with Corbin outside of the second-floor apartment. The two eventually ended up on the ground shortly before the police arrived. Killibrew did not know where the gun had come from and "had no idea" that it was defective.

Agent Gilbert, the final witness for the government,[8] testified that he was present on October 31, 1991, when Eason and Mitchell had reviewed her statement once more in anticipation of trial. Eason reaffirmed the contents of her statement and made no changes. Eason also recounted the encounter on the street that Mitchell had described, indicating that she believed the gun Corbin had brandished on that occasion was the same one he had carried on June 8. Eason said she was afraid of Corbin and wanted nothing to do with him. Like Mitchell, Gilbert did not recall Eason ever saying anything suggesting that she had realized the gun was not loaded or operational. Gilbert admitted, however, that when he received the gun from the Kokomo police, it was missing the back spring (which applies pressure to the hammer) as well as a small metal pin used to lock the cylinder into the frame. The government seemed to concede that absent these parts, the gun was not functional. (See Tr. at 105.)

Corbin presented three witnesses in his defense, none of whom were present at the June 8 incident. Each of them offered testimony that impeached Eason's credibility to some extent. Corbin's mother testified that Eason had described herself as an alcoholic and that she had seen Eason drinking and exhibiting signs of intoxication on several occasions. She had also seen Eason with Corbin a number of times and Eason had not acted as if she were afraid of him. Corbin's step-brother similarly testified that Eason had not expressed any fear of Corbin in any of the conversations he had had with her. He testified further that based on his discussions with Eason and with others in the community, he believed her to be a liar. Finally, Corbin's sister testified that about a month before the sentencing hearing, Eason had approached her and said that she didn't want to get Corbin into trouble. She too said that Eason had not exhibited fear of Corbin.

In rebuttal, the government recalled Gilbert, who reiterated that when he spoke with Eason on October 31, 1991, Eason told him that "[s]he didn't want anything to do with" Corbin. According to Gilbert, Eason was reluctant to testify because she feared retaliation from Corbin and his family. Eason had explained to Gilbert that Corbin had assaulted her on other occasions and seemed to think that he "owned" her.[9]

---

7. Mitchell revealed on cross-examination that he was already acquainted with Killibrew, having arrested him before on charges of trespass, intoxication, and possession of marijuana.

8. Gilbert had testified briefly before Judge Barker earlier in connection with the plea proceeding in order to establish the factual basis for the government's case against Corbin on the gun possession charge to which Corbin pled guilty.

At that time, however, his testimony was limited solely to Corbin's prior convictions and his possession of the gun. (Tr. at 15–20.)

9. Mitchell also testified on rebuttal. He reported that Eason had no prior criminal convictions, although she once had been arrested on charges of public intoxication and battery that arose from a marital dispute. Those charges had been dismissed.

Having heard the evidence, the district court concluded that Corbin had committed aggravated assault[10] while in possession of the gun and that he should be sentenced according to the Guideline provisions governing that offense. (Tr. at 191–93.)[11] Although Judge Barker had indicated at the outset of the hearing that the government need only establish the circumstances surrounding Corbin's possession of the gun by a preponderance of the evidence (*id.* at 44), she found that the government had succeeded in proving "by clear and convincing evidence, and perhaps even beyond that," that Corbin had committed an aggravated assault on Eason and possibly Killibrew as well. (*Id.* at 192.)

Based on that finding, the court calculated Corbin's sentence in accordance with Guidelines section 2A2.2, which governs aggravated assault. Beginning with a base offense level of 15 (§ 2A2.2(a)), the court added four levels for use of a firearm in committing the assault (§ 2A2.2(b)(2)(B)), two levels for the infliction of bodily injury (§ 2A2.2(b)(3)(A)), and finally, two additional levels for more than minimal planning (§ 2A2.2(b)(1)). (Tr. at 195, 200.)[12] The court declined to add another two levels for restraint of the victim (§ 3A1.3). (*Id.* at 195.)

The district court denied Corbin a two-level reduction under section 3E1.1 for acceptance of responsibility. Although Corbin had pled guilty, the court found that Corbin had not "come around to a point of genuinely accepting responsibility." (Tr. at 200.) Corbin had given a markedly different account of the events of June 8 in both a letter his counsel had written to the probation officer for purposes of the presentence report and in remarks Corbin himself had volunteered at the time of his plea. The court observed that the version of events Corbin had given in these two statements tended to exonerate him for everything but simple possession of a

firearm. (*Id.* at 200–01.) In particular, the court noted that Corbin maintained the gun was Killibrew's and that he had not brought it to Killibrew's apartment. (*Id.* at 201.) In the court's view, such representations signaled that Corbin had not truly accepted responsibility for what he had done. (*Id.*)

The various adjustments brought Corbin's offense level to 23. With a criminal history category of III, this yielded a sentencing range of 57 to 71 months of incarceration. The court imposed a sentence in the middle of the range—64 months—to be followed by three years of supervised release.

Corbin filed a timely notice of appeal from his sentence.

## II. DISCUSSION

### A. Sentencing Based on the Uncharged Offense of Aggravated Assault

■ Corbin's threshold objection focuses on the use of the guideline governing aggravated assault to calculate his sentence. Corbin argues that because he was never charged with aggravated assault and did not enjoy the opportunity to confront and cross-examine the witnesses against him or any of the other rights to which a trial on this charge would have entitled him, due process precluded the district court from sentencing him as if he had been convicted of this offense.

When Judge Barker calculated Corbin's sentence with reference to the circumstances surrounding his possession of the gun, she followed the express command of the Guidelines. Section 2K2.1(c), which applies to offenses involving the unlawful possession of firearms, provides:

(1) If the defendant used or possessed any firearm or ammunition in connection with the commission or attempted com-

---

10. " 'Aggravated assault' means a felonious assault that involved (a) a dangerous weapon with intent to do bodily harm (*i.e.*, not merely to frighten), or (b) serious bodily injury, or (c) an intent to commit another felony." U.S.S.G. § 2A2.2, comment. (n. 1).

11. As noted earlier, both the government and the probation officer had alternatively argued that

Corbin should be sentenced on the basis of unlawful restraint. However, the district court found the evidence insufficient to establish that offense. (Tr. at 191.)

12. The court found that more than minimal planning was involved in the assault based upon the incident between Corbin and Eason on the street on the day prior to June 8. (*See* Tr. at 200.)

mission of another offense, or possessed or transferred a firearm or ammunition with knowledge or intent that it would be used or possessed in connection with another offense, apply—

(A) § 2X1.1 (Attempt, Solicitation, or Conspiracy) in respect to that other offense, if the resulting offense level is greater than that determined above.

Section 2X1.1(a) in turn directs the court to use the base offense level for the underlying substantive offense, which in this case was aggravated assault (§ 2A2.2). This type of cross-referencing is based on the premise that a convicted person should be given a sentence that takes into account the full range of his or her conduct and thus reflects the reality of the crime. *See generally* U.S.S.G. § 1B1.3(a)(1) (defining relevant conduct to include "all acts and omissions committed ... by the defendant ... that occurred during the commission of the offense of conviction ... or that otherwise were in furtherance of that offense"); *United States v. Masters,* 978 F.2d 281, 284–85 (7th Cir. 1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2333, 124 L.Ed.2d 245 (1993); *see also United States v. Mason,* 974 F.2d 897, 898, 899 (7th Cir.1992); *United States v. Madewell,* 917 F.2d 301, 306 (7th Cir.1990).

In view of the express language of the cross-referencing provision at issue here, it was not only appropriate for the district judge to calculate Corbin's sentence in the way she did, but required. *See United States v. Smith,* 910 F.2d 326, 330–31 (6th Cir.1990) (per curiam) (vacating sentence where district court failed to cross-reference). Thus, we have previously upheld a felon-in-possession sentence that was enhanced exactly as Corbin's was here—on a finding that the defendant had committed aggravated assault. *Madewell,* 917 F.2d at 306; *see also United States v. Concepcion,* 983 F.2d 369, 386–88 (2d Cir.1992), *petition for cert. filed* (U.S. June 23, 1993) (No. 92–9190); *United States v. Harris,* 932 F.2d 1529, 1537 (5th Cir.), *cert. denied,* —— U.S. ——, ——, 112 S.Ct. 270, 324, 116 L.Ed.2d 223 (1991) and —— U.S. ——, 112 S.Ct. 914, 116 L.Ed.2d 814 (1992); *United States v. Willis,* 925 F.2d 359, 360–61 (10th Cir.1991);

*United States v. Perez,* 897 F.2d 751, 752–53 (5th Cir.), *cert. denied,* 498 U.S. 865, 111 S.Ct. 177, 112 L.Ed.2d 141 (1990); *United States v. Shinners,* 892 F.2d 742, 743 (8th Cir.1989) (per curiam). *Cf. United States v. Cherif,* 943 F.2d 692, 702–03 (7th Cir.1991) (although defendant had been convicted of mail and wire fraud, district court properly referenced insider trading guideline in fashioning appropriate sentence), *cert. denied,* —— U.S. ——, 112 S.Ct. 1564, 118 L.Ed.2d 211 (1992).

Corbin attempts to distinguish *Madewell,* noting that he pled guilty whereas Madewell was tried and convicted by a jury. But that distinction is irrelevant insofar as cross-referencing is concerned. Like Corbin, Madewell was never charged with aggravated assault and was convicted on a felon-in-possession charge alone. Nonetheless, Madewell's sentence was calculated using Guidelines section 2A2.2 after the district court found that he had committed aggravated assault with the gun. Although that finding may have rested on the evidence presented at trial, it was the court, and not the jury, that rendered the finding. *See* 917 F.2d at 306–07. Thus, like Corbin, Madewell did not enjoy the benefit of a trial on an aggravated assault charge.

We have also rejected arguments akin to Corbin's constitutional contention that he may not be sentenced with reference to a Guideline provision governing an offense on which he was not tried and convicted. In *Mason,* we reviewed the sentence of a defendant who had pled guilty to a felon-in-possession charge. After an evidentiary hearing, the district court concluded that Mason had committed forcible rape while in possession of the gun and therefore calculated his offense level with reference to the guideline governing the offense most similar to rape. The resulting increase in Mason's offense level was, as we noted, "dramatic." 974 F.2d at 899. Mason argued that it contravened due process to sentence him as a rapist when he had not been convicted of sexual assault and, indeed, a sexual assault charge against him in state court had been dismissed. *See id.* at 898–99. We rejected that argument without extended discussion, reasoning, as

**1384**

other courts have, that the district court had simply honored the Guidelines' directive to sentence the defendant in a way that reflected the true nature of the conduct underlying the offense of conviction. *Id.* at 899–90 (citing *Madewell,* 917 F.2d at 306; *Willis,* 925 F.2d at 361; and *United States .v. Bronaugh,* 895 F.2d 247, 251 (6th Cir.1990)).[13]

Our opinion in *Masters* suggests why the constitution does not preclude the court from calculating the defendant's sentence based on the actual nature of the conduct underlying the offense of conviction. *Masters* was convicted of racketeering and conspiracy to commit racketeering. However, the district court found that *Masters* was responsible for his wife's murder and sentenced him using the murder guideline. The consequences of the cross-reference calculation were once again dramatic: instead of the 33 to 41 months he otherwise would have received under the racketeering guideline, *Masters* was sentenced to two consecutive terms of 20 years (the statutory maximum). *Masters* argued that the district court was precluded from finding him responsible for killing his wife because the jury had not checked "murder" in the special verdict form that asked it to identify the racketeering activities in which he had engaged. In *Masters'* view, he had been implicitly acquitted of murder and so could not be sentenced as if he had been convicted of that crime. We explained why the argument was flawed:

> A sentence at the top of the statutory range does not punish *Masters* for a crime he didn't commit; it uses all available information about his character and dangerousness in choosing the sentence for the crime of which he stands convicted. Judges have been considering defendants' activities and character since long before there were guidelines, with consistent approval from the highest court. E.g., *Roberts v. United States,* 445 U.S. 552, 100 S.Ct. 1358, 63 L.Ed.2d 622 (1980); *United*

*States v. Grayson,* 438 U.S. 41, 98 S.Ct. 2610, 57 L.Ed.2d 582 (1978); *Williams v. Oklahoma,* 358 U.S. 576, 79 S.Ct. 421, 3 L.Ed.2d 516 (1959); *Williams v. New York,* 337 U.S. 241[, 69 S.Ct. 1079, 93 L.Ed. 1337] (1949); see also *Chapman v. United States,* —— U.S. ——, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991); *United States v. Pinto,* 875 F.2d 143 (7th Cir. 1989). This is one reason why we have held that judges may take other crimes into account when selecting a sentence under the guidelines, even if the defendant has been charged with and acquitted of those crimes. *United States v. Fonner,* 920 F.2d 1330, 1332–34 (7th Cir.1990); see also, e.g., *United States v. Morrison,* 946 F.2d 484, 501 (7th Cir.1991); *United States v. Welch,* 945 F.2d 1378, 1385 (7th Cir. 1991); *United States v. Lawrence,* 934 F.2d 868, 873–74 (7th Cir.1991), *id.* at 875 (concurring opinion). An acquittal means that the charge was not proven beyond a reasonable doubt; it does not mean that the defendant didn't do it. *Dowling v. United States,* 493 U.S. 342, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990)....

978 F.2d at 285–86. We have more than once acknowledged the "self-evident" unfairness of sentencing a defendant based on uncharged criminal acts. *United States v. Ebbole,* 917 F.2d 1495, 1496 (7th Cir.1990) (citing *United States v. Johnson,* 658 F.2d 1176, 1179 (7th Cir.1981)). Yet, as *Masters* reveals, we have also upheld the practice repeatedly in view of its longstanding acceptance by the Supreme Court. *See* 978 F.2d at 285–86; *see also United States v. Duarte,* 950 F.2d 1255, 1263 (7th Cir.1991), *cert. denied,* —— U.S. ——, 113 S.Ct. 174, 121 L.Ed.2d 120 (1992); *Ebbole,* 917 F.2d at 1496. Thus, the fact that Corbin was never charged with aggravated assault or convicted of that offense does not preclude a court from taking such conduct into account in fashioning an appropriate sentence within the statutory range for the possession conviction.[14]

**13.** In *Mason* we focused primarily on the defendant's jurisdictional argument that due process precludes the use of cross referencing to federalize what are essentially *state* crimes. *See* 974 F.2d at 898–99. Nonetheless, our conclusion that the sentencing court can consider conduct amounting to an uncharged state offense necessarily includes the more general proposition that due process permits sentencing based on *any* uncharged offense, state or federal.

**14.** Corbin's counsel himself agreed that the law did not entitle Corbin to have a jury resolve sentencing factors. (Tr. at 188.)

Given the formulaic nature of the Guidelines, the enhanced sentence Corbin has received for possessing the handgun may be indistinguishable from the sentence he would have received if he had been convicted of aggravated assault. But this does not require that he be tried for assault before his sentence may be enhanced. The increased sentence remains within the zero to ten-year range applicable to the felon-in-possession conviction (18 U.S.C. § 924(a)(2)). *See United States v. Mobley*, 956 F.2d 450, 457 (3d Cir.1992). Moreover, the enhancement simply reflects the gravity of the circumstances surrounding Corbin's possession of the firearm. Corbin is not someone who merely kept a gun at home for protection or recreation. Rather, he brandished the weapon at Eason and the others, pressed it against Eason's eye, and evidently struck Killibrew in the head with it, all in an effort to force Eason to leave Killibrew's apartment against her will. Corbin's sentence thus reflects the common sense notion that one who puts a firearm to a nefarious use deserves a sentence more harsh than one who does no more than possess the gun. *See Mason*, 974 F.2d at 898 ("As the government correctly points out, 'how a firearm is used is of utmost importance in determining the proper sentence for the defendant convicted of its possession.'"); *Willis*, 925 F.2d at 361 ("[W]e think it obvious that the culpability—and the resultant punishment—of a person who passively possesses a gun is different than the person who possesses that same gun but also uses it in a drive-by shooting."). Prior to the Guidelines, a sentencing judge would have had the discretion to increase Corbin's sentence to reflect the gravity of his conduct, and the exercise of that discretion would have been unremarkable. *See Concepcion*, 983 F.2d at 387–88; *United States v. Kimball*, 741 F.2d 471, 474–75 (1st Cir.1984); *see also United States v. Johnson*, 507 F.2d 826, 829–30 (7th Cir.1974), *cert. denied*, 421 U.S. 949, 95 S.Ct. 1682, 44 L.Ed.2d 103 (1975).

The Sentencing Guidelines simply accomplish the same end through the more formal and mechanical process of cross-referencing. *See Concepcion*, 983 F.2d at 388; *Willis*, 925 F.2d at 361–62; *see also United States v. Galloway*, 976 F.2d 414, 425 (8th Cir.1992) (en banc), *cert. denied*, —— U.S. ——, 113 S.Ct. 1420, 122 L.Ed.2d 790 (1993); *Ebbole*, 917 F.2d at 1496–98.

## B. *Reliance on Hearsay Testimony*

No eyewitness to Corbin's conduct in Killibrew's apartment testified at the sentencing hearing. Instead, the government relied on Eason's transcribed statement and on the testimony of the police officers who had interviewed Eason and Killibrew. Corbin argues that without corroboration from non-hearsay sources, that evidence does not suffice to support the court's finding that he committed aggravated assault.

The Federal Rules of Evidence do not apply in sentencing proceedings, except with respect to matters of privilege. Fed. R.Evid. 1101(d)(3); *United States v. Morales*, 994 F.2d 386, 389 (1993); *United States v. Jewel*, 947 F.2d 224, 237 & n. 20 (7th Cir. 1991); *see also* U.S.S.G. § 6A1.3(a); 18 U.S.C. § 3661. We therefore have held that hearsay is permitted in the sentencing context, so long as (1) the evidence is reliable and (2) the defendant is afforded the opportunity to rebut the evidence. *United States v. Campbell*, 985 F.2d 341, 348 (7th Cir.1993); *Jewel*, 947 F.2d at 237; *see* U.S.S.G. § 6A1.3(a) (sentencing judge may consider any relevant information so long as it "has sufficient indicia of reliability to support its probable accuracy"). "The determination of whether hearsay is sufficiently reliable to warrant credence for sentencing purposes necessarily depends upon the particular circumstances of each case." *United States v. Wise*, 976 F.2d 393, 403 (8th Cir.1992) (en banc), *cert. denied*, —— U.S. ——, 113 S.Ct. 1592, 123 L.Ed.2d 157 (1993).[15]

---

15. Corbin has not invoked the Sixth Amendment's Confrontation Clause in challenging his sentence and thus we need not consider what requirements, if any, that constitutional provision might impose on sentencing hearings. We note, however, that at least eight circuits have held that the Confrontation Clause does not apply in sentencing proceedings, despite the increased significance these proceedings have taken on with the advent of the Sentencing Guidelines. *See United States v. Petty*, 982 F.2d 1365, 1368, 1370 (9th Cir.) (collecting cases), *amended*

In this case, after hearing all of the evidence presented at the sentencing hearing, Judge Barker found the government's evidence to be reliable and set forth at length the circumstances that led her to that conclusion. (Tr. at 119–21.) [16] We may not disturb this finding absent a showing that the district court abused its discretion. *Jewel,* 947 F.2d at 237. Corbin has not succeeded in making such a showing here.

The statements of Eason and Killibrew, as recounted by the investigating officers, were consistent with one another. Each recounted the same sequence of events: Corbin broke into Killibrew's apartment brandishing a gun, pressed the gun against Eason's face and demanded that she leave with him, scuffled with Killibrew, and pursued Eason as she attempted to flee. Further, as the government points out, the statements Eason and Killibrew made without the benefit of reflection and consultation when the police first arrived at the scene were consistent with what Eason said later in her discussions with the police.

Even if we were to accept Corbin's argument that some non-hearsay corroboration is required in order to render the hearsay admissible,[17] the contemporaneous observations of Lieutenant DiNardo and Sergeant Nutt when they arrived at Killibrew's apartment

---

on other grounds, 992 F.2d 1015 (9th Cir.1993). Although a number of these circuits have recognized that the constitutional guarantee of due process places some limits on the use of hearsay at sentencing, they have also concluded that Guidelines section 6A1.3(a)—which permits the sentencing court to consider otherwise inadmissible evidence as long as it has "sufficient indicia of reliability to support its probable accuracy"— comports with that limit. *See, e.g., United States v. Silverman,* 976 F.2d 1502, 1512–13 (6th Cir. 1992) (en banc), *cert. denied,* —— U.S. ——, 113 S.Ct. 1595, 123 L.Ed.2d 159 (1993); *United States v. Wise, supra,* 976 F.2d at 402. Our own precedents, which likewise acknowledge the defendant's due process right to be sentenced on the basis of reliable information (*see United States v. Musa,* 946 F.2d 1297, 1306 (7th Cir. 1991)), are consistent with this line of authority. *See United States v. Richards,* 784 F.Supp. 1373, 1377 (N.D.Ind.1992), *aff'd sub nom. United States v. Johnson,* 997 F.2d 248 (7th Cir.1993).

16. Judge Barker cited the following circumstances as support for her conclusion that the evidence was reliable: (1) Eason had signed her statement under penalty of perjury and made the statement under circumstances that tended to suggest the statement's accuracy; (2) Killibrew's statements, as recounted by Mitchell and DiNardo, were consistent with Eason's statement; (3) the first-hand observations of the arresting officers tended to confirm the accounts given by Eason and Killibrew; (4) the marks observed on Eason and Killibrew also tended to corroborate their story; (5) the police had followed regular and reliable procedures in conducting their investigation and preparing their reports; (6) the police were familiar with both Eason and Killibrew as the result of prior contacts with them. (Tr. at 119–121.)

17. Corbin relies on *United States v. Cammisano,* 917 F.2d 1057, 1062 (8th Cir.1990), for this proposition. In *Cammisano,* the district court departed upward from the sentencing range based upon its finding that the defendant was affiliated with organized crime. On appeal, the Eighth Circuit found that the evidence on which the district court had relied for this finding was not sufficiently reliable. The bulk of the relevant testimony had been supplied by FBI agents, who recounted what they had learned about the defendant from unnamed confidential informants, who in turn had acquired the information from other unidentified sources. Although the government argued that the informants had corroborated one another, the court deemed this inadequate to establish the reliability of the government's evidence. "[T]his is merely 'hearsay upon hearsay' and does not 'constitute sufficiently reliable or credible evidence to support the conclusion that defendant[] w[as] connected to organized crime.'" 917 F.2d at 1062 (quoting *United States v. Cortina,* 733 F.Supp. 1195, 1202 (N.D.Ill.1990)).

Notably, *Cammisano* does not hold that non-hearsay corroboration is required in all cases. Rather, the court simply concluded that given multiple levels of hearsay and unidentified declarants, corroboration among the hearsay sources themselves was not adequate to prove the evidence reliable. 917 F.2d at 1062. Here, in contrast, the declarants were all identified, Corbin's counsel had the opportunity to cross-examine the officers about the declarants' statements, and the testimony regarding these statements did not represent the same degree of hearsay as in *Cammisano. Cf. United States v. Radix Laboratories, Inc.,* 963 F.2d 1034, 1040 (7th Cir. 1992) (rejecting multiple-level hearsay objection to sentencing testimony of government official who had described affidavits of defendants' former employees, where defense counsel had opportunity to cross-examine the official and to point out weaknesses in the reliability of the affidavits). Moreover, as we observe below, the first-hand observations of the police officers who arrested Corbin corroborated the hearsay in significant respects.

building (*see* page 1380, *supra* ) suffice to supply that corroboration. These first-hand observations tend to confirm that a violent encounter of some kind had taken place and that Corbin had used the gun to assault Eason and perhaps Killibrew as well. Indeed, the officers' accounts are not only consistent with what Eason and Killibrew (as well as Davis) told them, but are *inconsistent* with Corbin's representation that he had merely waved the gun around casually.

There is also no question that Corbin had the opportunity to rebut the government's hearsay evidence. The defense had access to Eason's statement several weeks in advance of the sentencing hearing and was notified more than a month before the hearing the government would not be calling Eason as a witness. The defense took advantage of the opportunity to cross-examine the government's witnesses and presented three witnesses of its own, although, like the government, the defense did not call any witnesses with first-hand knowledge of what had occurred.

The government's decision not to call *any* of the eyewitnesses to the critical events of the case might give one pause. Eason's reluctance to testify is understandable—she had been assaulted by Corbin more than once. But why the government did not call Killibrew, Davis, Pollard or Harrison is not so clear.

■ Nonetheless, the district judge found the government's hearsay evidence to be reliable, and she did not abuse her discretion in doing so. Nothing that Corbin presented to the district court or that he has argued on appeal calls the reliability of the government's evidence into question. Eason and Killibrew may not have had unblemished pasts, but it was well within the province of the district court to find their hearsay statements reliable in view of the totality of the evidence. *See United States v. Musa*, 946 F.2d 1297, 1306–07 (7th Cir.1991). Therefore, the district court did not err in relying on hearsay in finding that Corbin had committed an aggravated assault.

### C. Evidentiary Standard

■ Corbin next argues that the government was required to prove beyond a reasonable doubt that he committed an aggravated assault. This argument plainly fails in light of well-established precedent.

■ A preponderance of the evidence is normally all the support necessary for a factual finding under the Guidelines. *E.g., Masters*, 978 F.2d at 287; *United States v. Trujillo*, 959 F.2d 1377, 1381–82 (7th Cir.), cert. denied, —— U.S. ——, 113 S.Ct. 277, 121 L.Ed.2d 204 (1992); *United States v. Schuster*, 948 F.2d 313, 315 (7th Cir.1991). See generally *McMillan v. Pennsylvania*, 477 U.S. 79, 84, 106 S.Ct. 2411, 2415, 91 L.Ed.2d 67 (1986). A higher standard might be called for only in the rare instance where a factual finding will result in a sentencing increase so great "that the sentencing hearing can fairly be·characterized as 'a tail which wags the dog of the substantive offense.'" *Schuster*, 948 F.2d at 315 (citations omitted); *see also Trujillo*, 959 F.2d at 1382; *Masters*, 978 F.2d at 287.

Although cross-referencing resulted in a significantly greater sentence for Corbin, the enhancement was not so serious as to require a burden of proof commensurate with trial. Here, the "other" conduct that the district court considered underlay the very offense to which Corbin pled guilty, as opposed to conduct that occurred on different or unrelated occasions. *See McMillan*, 477 U.S. at 92, 106 S.Ct. at 2419 ("Sentencing courts necessarily consider the circumstances of an offense in selecting the appropriate punishment, and we have consistently approved sentencing schemes that mandate consideration of facts related to the crime without suggesting that those facts must be proved beyond a reasonable doubt.") (citation omitted). *Compare, e.g., Ebbole*, 917 F.2d at 1495–96 (defendant pled guilty to distributing one gram of cocaine to a police officer, but was sentenced on the basis of additional sales over a three-month period totalling 1.7 kilograms). As we acknowledged earlier, Corbin's sentence may be identical to what he would have received had he been convicted of aggravated assault. Yet, this only means "that under certain circumstance[s] Congress and the [Sentenc-

ing] Commission have set the same penalties. This is not the situation of a tail wagging the dog; but rather, of two dogs having tails of equal length." *Mobley,* 956 F.2d at 457. Cross-referencing the aggravated assault provision may also have more than doubled Corbin's sentencing range,[18] and we do not mean to trivialize that consequence. Nonetheless, the enhanced sentence remains within the statutory range, and the increase is far less dramatic than we have seen in other cases where we found the preponderance standard acceptable. *See, e.g., Masters,* 978 F.2d at 286–87 (sentence enhanced from range of 33 to 41 months to consecutive twenty-year terms); *Ebbole,* 917 F.2d at 1495–96 (more than three-fold increase in sentencing range). *Compare United States v. Kikumura,* 918 F.2d 1084, 1101–02 (3d Cir.1990) (twelve-fold upward departure to term of 30 years required clear and convincing evidence).

Finally, although we have concluded that no more exacting a burden than a preponderance of the evidence was required, we note that the district judge found that Corbin had committed aggravated assault by "clear and convincing evidence, and perhaps even beyond that...." (Tr. at 192.) Therefore, even if this situation could be characterized as an instance of "the tail wagging the dog," Corbin enjoyed the benefit of an appropriately higher evidentiary standard. Granted, the district court did not render its finding *beyond a reasonable doubt.* But Corbin's invocation of this standard really is a reprise of his argument that he may not be sentenced with reference to the aggravated assault guideline unless he has been convicted of that offense, an argument we have already

rejected. Even cases acknowledging that a higher burden of proof might sometimes be appropriate do not embrace a standard as demanding as proof beyond a reasonable doubt. *See Trujillo,* 959 F.2d at 1382; *Kikumura,* 918 F.2d at 1101–02.

### D. *Acceptance of Responsibility*

 Finally, Corbin challenges the district court's refusal to grant him a two-level reduction for acceptance of responsibility under Guidelines section 3E1.1. Pleading guilty to an offense does not necessarily entitle the defendant to such a reduction. *United States v. Skinner,* 986 F.2d 1091, 1100 (7th Cir.1993). A defendant accepts responsibility only if he "fesses up to his actual offense." *Id.* (quoting *United States v. Escobar–Mejia,* 915 F.2d 1152, 1153 (7th Cir.1990)). The propriety of a reduction under section 3E1.1 is thus a factual matter that the district judge is uniquely situated to resolve. *United States v. White,* 993 F.2d 147, 151 (7th Cir. 1993); *United States v. Guadagno,* 970 F.2d 214, 224 (7th Cir.1992); *United States v. Franklin,* 902 F.2d 501, 505 (7th Cir.), *cert. denied,* 498 U.S. 906, 111 S.Ct. 274, 112 L.Ed.2d 229 (1990). *See* 18 U.S.C. § 3742(e), U.S.S.G. § 3E1.1, comment. (n. 5). We may reverse the district court's judgment on this question only if it is clearly erroneous. *E.g., Guadagno,* 970 F.2d at 224; *United States v. Beal,* 960 F.2d 629, 632 (7th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 230, 121 L.Ed.2d 166 (1992).[19]

Acknowledging that it was a "close call" (Tr. at 200), the district court concluded that although Corbin had pled guilty to the possession charge, he had not demonstrated genuine acceptance of responsibility:

---

18. This assumes that Corbin's sentence would have been calculated pursuant to the November 1990 version of the Guidelines (*see* n. 3, *supra*), beginning with a base offense level of 12 (§ 2K2.1(a)(2)), adding two levels for possession of a gun with an obliterated serial number (§ 2K2.1(b)(2); *see United States v. Schnell, supra* n. 3, 982 F.2d at 219–22), and withholding a two-level decrease for acceptance of responsibility (*see* subsection D, *infra*). The resulting adjusted offense level of 14, coupled with Corbin's Category III criminal history, would have produced a sentencing range of 21 to 27 months, far less than the range of 57 to 71 months yielded by the aggravated assault guideline.

19. Of course, to the extent that Corbin raises a purely legal question regarding denial of the section 3E1.1 reduction, our review is plenary. *United States v. Frierson,* 945 F.2d 650, 655 (3d Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1515, 117 L.Ed.2d 651 (1992); *see also United States v. Cojab,* 978 F.2d 341, 343 (7th Cir.1992) (matters involving construction of the Guidelines, as opposed to findings of fact, are subject to *de novo* review). As we explain below, however, we need not reach Corbin's constitutional argument on the particular facts of this case.

In fact, the matters set out in the letter that Mr. Stern [Corbin's counsel] sent to Mr. Brewer, the probation officer, and his statement that he made at the time of his plea suggest that he has an entirely different factual scenario for what occurred, which, if believed, would exonerate him from any responsibility for anything other than the possession, and in fact it almost exonerates him from the possession of the firearm, although I guess he does finally come around to the position where he agrees that he was a convicted felon, a prior convicted felon, in possession of that firearm. But he doesn't claim any responsibility for having brought it to the place, having possessed it. He says it belonged to Mr. Killibrew, and that he simply picked it up, o[r] something like that. And in my judgment that report is not plausible in any way, and I am not inclined to believe that, and that bears on my conclusion that he has not accepted responsibility for this offense and so is not entitled to that deduction.

(*Id.* at 200–01.) Corbin contends that the district court refused to grant him the two-level reduction under section 3E1.1 because he did not concede culpability for the aggravated assault. In Corbin's view, that rationale violates his fifth amendment right against self-incrimination, because it requires him to admit crimes for which he might still be prosecuted.[20]

This argument is a nettlesome one that has divided the courts of appeals. A number of circuits have either held or suggested that the reduction for acceptance of responsibility may not be conditioned upon a defendant's willingness to acknowledge criminal conduct beyond the particular offense to which he has pled guilty. *United States v. Frierson,* 945 F.2d 650 (3d Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1515 (1992); *United States v. Piper,* 918 F.2d 839, 840–41 (9th Cir.1990) (per curiam); *United States v. Oliveras,* 905 F.2d 623 (2d Cir.1990) (per curiam); *United States v. Perez–Franco,* 873 F.2d 455 (1st Cir.1989); *see also United States v. Guarin,* 898 F.2d 1120, 1122 (6th Cir.1990). These courts reason that when a defendant is denied the reduction because he will not to admit to other criminal acts for which he still might be prosecuted, he is effectively penalized for the exercise of his fifth amendment right against self-incrimination. *See Frierson,* 945 F.2d at 656–60; *Oliveras,* 905 F.2d at 626–28; *Perez–Franco,* 873 F.2d at 461–63;[21] *see also United States v. Aichele,* 941 F.2d 761, 767–70 (9th Cir.1991) (dissenting op.) Other circuits have rejected this rationale. They reason that to deny the defendant a two-level reduction because he will not acknowledge the full extent of his criminal behavior is simply to withhold a benefit, not to impose a penalty. Thus, in the view of these courts, section 3E1.1 places no unconstitutional burden on the defendant's right against self-incrimination. *United States v. Ross,* 920 F.2d 1530, 1537 (10th Cir.1990); *United States v. Mourning,* 914 F.2d 699, 706–07 (5th Cir.1990); *United States v. Gordon,* 895 F.2d 932, 936–37 (4th Cir.), *cert. denied,* 498 U.S. 846, 111 S.Ct. 131, 112 L.Ed.2d 98 (1990); *United States v. Henry,* 883 F.2d 1010, 1011–12 (11th Cir.1989) (per curiam); *see also United States v. Frazier,* 971 F.2d 1076, 1080–87 (4th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1028, 122 L.Ed.2d 173 (1993). *Cf. United States v. Herrera,* 928 F.2d 769, 774–75 (6th Cir.1991) (affirming denial of reduction without discus-

**20.** The government agreed not to prosecute Corbin for any other offenses relating to his possession of the revolver (*see* Memorandum of Plea Agreement ¶ 5(A)), but the State of Indiana presumably remained free to prosecute him for aggravated assault. *See United States v. Frierson, supra* n. 19, 945 F.2d at 657.

**21.** These courts construe section 3E1.1 differently. In *Oliveras* and *Perez–Franco,* concern for the privilege against self-incrimination led the courts to construe section 3E1.1 to permit consideration only of the offense of conviction. *See Oliveras,* 905 F.2d at 628–32; *Perez–Franco,* 873

F.2d at 463–64. *See also United States v. Rogers,* 921 F.2d 975, 982 (10th Cir.), *cert. denied,* 498 U.S. 839, 111 S.Ct. 113, 112 L.Ed.2d 83 (1990); *Piper,* 918 F.2d at 840–41. In contrast, the Third Circuit found in *Frierson* that section 3E1.1 on its face permitted the sentencing judge to consider other, related criminal conduct, 945 F.2d at 656; nevertheless, the court agreed that the fifth amendment (as opposed to the guideline itself) might preclude the judge from withholding the acceptance of responsibility reduction if the defendant refused to acknowledge culpability for that conduct, *id.* at 656–60.

sion of fifth amendment where although defendant had admitted responsibility for drugs listed in indictment, he did not acknowledge additional amounts).[22]

We recently expressed agreement with this second line of authority. *United States v. Cojab,* 978 F.2d 341, 343 (7th Cir.1992). We observed:

> Section 3E1.1 may well affect how criminal defendants choose to exercise their constitutional rights. But "not every burden on the exercise of a constitutional right, and not every encouragement to waive such a right is invalid." *Corbitt v. New Jersey,* 439 U.S. 212, 219, 99 S.Ct. 492, 493–97, 58 L.Ed.2d 466 (1978). To hold the acceptance of responsibility provision unconstitutional would be to say that defendants who express genuine remorse for their actions can never be rewarded at sentencing. This the Constitution does not require. *United States v. Henry,* 883 F.2d 1010 (11th Cir.1989).

978 F.2d at 343–44. Thus, assuming that Corbin was forced to exercise his privilege against self-incrimination at the expense of a two-level reduction for acceptance of responsibility, *Cojab* suggests that this is not a constitutionally unacceptable cost for him to bear.[23]

 We need not resolve the question here, however, for even if we were to agree as a constitutional matter that a section 3E1.1 reduction may not be conditioned upon a defendant's willingness to acknowledge criminal conduct beyond the offense to which he has pled guilty, Corbin would not be entitled to relief. As the Third Circuit recognized in *Frierson,* the privilege against self-incrimination is not self-executing, but must be affirmatively invoked. 945 F.2d at 660 (citing *Minnesota v. Murphy,* 465 U.S. 420, 429, 104 S.Ct. 1136, 1143, 79 L.Ed.2d 409 (1984)). Corbin never did so. True, the

failure to invoke the privilege may be excused if the defendant was forced to choose between incriminating himself and suffering a penalty for exercising his privilege not to do so. *See Murphy,* 465 U.S. at 434–35, 104 S.Ct. at 1146. For example, in *Garrity v. New Jersey,* 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967), the Supreme Court found that the defendant police officers did not waive the privilege when they answered the questions put to them because they were threatened with discharge from their jobs if they invoked the privilege and refused to answer. However, for this coercion exception to apply, the threat of a penalty for remaining silent must have been explicit. The fact that a defendant is expected to give candid answers in a particular situation and *might* suffer adverse consequences if he does not (*e.g.,* in response to questions from his probation officer) is not enough to excuse him from affirmatively invoking his fifth amendment privilege if he does not wish to incriminate himself. *See Murphy,* 465 U.S. at 435, 104 S.Ct. at 1146; *Frierson,* 945 F.2d at 661.

*Frierson* is particularly pertinent here. In that case, the defendant pled guilty to robbing a bank by intimidation. Frierson admitted to the probation officer that he had handed the bank teller a note that said "Give me your money, I have a gun," but he refused to acknowledge that he actually had a gun in his possession at the time. Indeed, Frierson specifically denied this allegation in a preindictment interview with the FBI and again during a presentence interview with his probation officer. After an evidentiary hearing at which Frierson declined to testify, the district court concluded that Frierson had possessed a gun and denied him the two-level reduction under section 3E1.1 because he had refused to admit it. On appeal, the Third Circuit agreed with Frierson that a defendant could not be *required* to admit acts

---

**22.** The Supreme Court recently declined an opportunity to address this issue. *See Kinder v. United States,* —— U.S. ——, ——, 112 S.Ct. 2290, 2293, 119 L.Ed.2d 214 (1992) (White, J., dissenting from denial of *certiorari*).

**23.** As we noted in *White,* 993 F.2d at 150, we have not yet squarely decided whether the consideration of conduct beyond the offense of con-

viction in the context of a section 3E1.1 determination might impinge on the defendant's fifth amendment right against self-incrimination. Although we did reject the defendant's fifth amendment argument in *Cojab,* that case involved the defendant's refusal to provide financial information to his probation officer, not his unwillingness to acknowledge other criminal conduct.

beyond the scope of his plea (and for which he might still be indicted) in order to receive credit for acceptance of responsibility. 945 F.2d at 658–60. Nonetheless, the court found that there had been no violation of Frierson's fifth amendment privilege, because the district court had based its finding on his prior statements to the FBI and the probation officer rather than his silence at the evidentiary hearing. Neither of these statements about the gun had been compelled, in the court's view—that is, Frierson had not been threatened with a penalty in the event he chose to say nothing at all about the gun. *Id.* at 662. Thus, although the court agreed that it *would* have violated Frierson's fifth amendment privilege to tell him he must answer questions about the gun or forego credit for acceptance of responsibility, *see id.* at 658–60, it found that this scenario had not come to pass. Instead, Frierson's statements about the gun had been voluntary, and the district court, having concluded that they were false, was free to rely on them as evidence that Frierson had not accepted responsibility. *Id.* at 662.[24]

Citing *Frierson,* we recently upheld the denial of a section 3E1.1 reduction where the defendant had voluntarily made both oral and written representations regarding his other conduct that the district court found to be false. *White,* 993 F.2d at 151.

In his interview with the probation officer, White neither exercised his Fifth Amendment privilege, nor remained silent. White's oral statements and his written version of the offense vigorously denied the government's statement of relevant conduct. As a result, White exposed his denials of relevant conduct to the scrutiny of the district court.

... The district judge clearly did not believe White's protestations of innocence after considering the PSI, the govern-

ment's account of events, the victim impact statement, and White's statements and demeanor. The district judge also found that White did not accept responsibility for his actions and only exhibited regret because he was caught. A desire to minimize a criminal sentence is distinguishable from acceptance of responsibility—the former will not provide a basis for a § 3E1.1 reduction. The district court properly considered White's denials of relevant conduct when deciding whether a § 3E1.1 reduction was warranted and did not commit clear error when it refused to grant a reduction for acceptance of responsibility.

*Id.* (citations and footnote omitted).

Just as in *Frierson* and *White,* the district court's decision to deny Corbin credit for acceptance of responsibility was based not on his silence at the sentencing hearing (or at any earlier juncture), but rather on the exculpatory statements that he had voluntarily made to the court and to his probation officer. Judge Barker's remarks at sentencing, which we have recounted above, make this clear. She in no way suggested that Corbin's decision not to testify at the hearing influenced her assessment of his entitlement to a reduction under section 3E1.1. Instead, she focused on the letter his counsel had sent to the probation officer and his own remarks at the time of his plea and found that these statements recited an implausible version of events calculated to exonerate him from responsibility for what had transpired. (Tr. at 200–01.)

Although the letter is not in the record, its contents were summarized in the presentence report:

According to a statement submitted by the defense attorney, on June 8, 1991, Willie Corbin, Jr. was out drinking with Earl Davis, Rodney Kill[i]brew, and Lanette

---

24. The dissent disagreed and found that Frierson *had* been threatened with a penalty if he chose to remain silent about his use of a gun. Before Frierson met with the probation officer, the government had given him an unpublished opinion in which a district court had denied a defendant an acceptance of responsibility deduction because, like Frierson, that defendant had not admitted that he had carried a gun. The dissent viewed this as an explicit threat that if Frierson

did not admit possession of the gun, he too would be denied credit for acceptance of responsibility. Thus, the dissent would have held that Frierson was faced with a constitutionally unacceptable choice when he met with his probation officer: admit that he had carried a gun and risk further prosecution, or deny possession and forfeit the two-level reduction under section 3E1.1. 945 F.2d at 665–66. As we make clear below, Corbin was never backed into this corner.

Eason. They had been together off and on since 9:30 the night before. They all consumed a lot of alcohol, and were drunk. Both Lanette Eason and Willie Corbin, Jr. had used cocaine. Rodney Kill[i]brew had smoked marijuana. They went to Rodney's apartment where Willie Corbin picked up Rodney Kill[i]brew's .32 Clerke 1st revolver. The gun was lying out in the open, either on a shelf or a table, and it was unloaded and non-functional. Willie Corbin, Jr. then waved the gun around for awhile. Rodney Kill[i]brew and Lanette Eason knew Rodney Kill[i]brew's gun was non-functional. Willie Corbin, Jr. was not sure whether Earl Davis knew. Willie Corbin, Jr. put the gun in his back pocket and left the apartment. Willie Corbin, Jr. was then picked up outside the apartment by the police, with the gun in his pocket. The police also searched Earl Davis and Rodney Kill[i]brew.

The gun was broken. It was missing pistol grips and the pin that held the barrel in place. The gun also had an obliterated serial number. When Willie Corbin picked up the gun, he had no idea it had an obliterated serial number. The gun involved in this matter did not belong to Willie Corbin, but to Rodney Kill[i]brew. Willie Corbin, Jr. admits he had the gun, he is a convicted felon, and he has violated the federal law 18 U.S.C. § 922(g)(1). . . .

(Presentence Report at 9, ¶¶ 9–10.) [25]

Corbin himself interjected similar remarks during the plea hearing. At that time, the government proffered only the particular facts establishing a violation of the felon-in-possession statute. After recounting Corbin's prior convictions and his arrest on June 8, ATF Agent Gilbert testified as follows:

At the time of his arrest two officers who conducted the arrest found and seized a Clerke 1st, manufactured by Technicorp, .32 Smith & Wesson caliber revolver. This firearm had previously moved in interstate commerce, having been manufactured at Santa Monica, California, and thereafter shipped to Valler Firearms in Miami, Florida, and then shipped to a firearm dealer in Lima, Ohio.

The incident involving his arrest was at 712 and a half North Union Street, at Kokomo, Indiana.

On September 5, 1991 I test-fired this particular firearm seized from Willie Corbin, and found it to function as a firearm as defined by federal law.

(Tr. at 17.) Gilbert said nothing else about the circumstances that had culminated in Corbin's arrest.[26] Nonetheless, when Judge Barker asked Corbin whether there was anything inaccurate about the government's proffer, Corbin apparently understood the question as an invitation to discuss the surrounding circumstances, and again he attempted to volunteer an exculpatory version of events:

> THE COURT: Mr. Corbin, you've heard the testimony of Mr. Gilbert. Is what he's told me true, about the allegations in Count 1, as far as you know?
>
> DEFENDANT CORBIN: No, it is not, your Honor.
>
> THE COURT: All right. What is not true about what he's told me?
>
> Step to the desk, there, so we can hear you.
>
> DEFENDANT CORBIN: Well, it was—It happened June 8. The gun wasn't

---

**25.** Although this letter was written by Corbin's attorney rather than Corbin himself, we assume that it recounted accurately what Corbin had told his counsel. In any case, Corbin has not attempted to argue that his attorney provided an account that was not his own. Indeed, Corbin has repeated in his opening brief the same version of events set forth in his letter to the probation officer. (See Corbin Br. at 3–4.) Moreover, the government indicated at the sentencing hearing that the letter had been read to Corbin and Corbin had been asked whether he agreed with it. (Tr. at 182.) Presumably Corbin had answered in the affirmative, for neither the defense

nor the court corrected or contradicted the government.

**26.** Agent Gilbert did note briefly that Corbin had been arrested in response to "a complaint of a disturbance" and that he had been charged with criminal confinement, among other things. (Tr. at 17.) However, the remainder of Gilbert's remarks were limited to the gun found in Corbin's possession. He did not describe any of the other circumstances that had brought officers to the scene, nor did he attempt to recount what witnesses had told the police about Corbin's use of the gun. (See id. at 17–19.)

mine. The gun was in [the] apartment. I picked the gun up. I didn't know nothing about the—

THE COURT: He didn't testify to any of those matters, Mr. Gilbert—or Mr. Corbin; that's why I asked you to pay attention to what he was testifying to. . . .

(Tr. at 20.) After the district court repeated the substance of Gilbert's testimony, Corbin finally conceded that the proffer was accurate. (*Id.* at 20–21.)

Nothing in the record suggests that Corbin was compelled to make these exculpatory statements. In particular, there is no evidence that either the government or the district court told Corbin that he would be denied credit for acceptance of responsibility if he chose not to speak about the circumstances surrounding his possession of the gun. The government did object to the probation officer's recommendation that Corbin be given the reduction, but it did so on the basis of the exculpatory version of events Corbin and his counsel already had given to the probation officer. Similarly, in reiterating its opposition to the reduction at the close of the evidentiary hearing, the government referred solely to the affirmative disclaimers that Corbin had volunteered, not to anything that he had declined to speak about at the hearing:

> When the defendant earlier today was asked if he had any comments or questions when the government presented its factual basis to the court, he basically denied that it was his gun. He admitted that he had a gun, but he said he came into the apartment and found the gun in there, and it was Rodney Killibrew's gun. At least I heard him say that, or words to that effect. And that's certainly consistent with the

position he adopted with the probation department in the presentence report.

> It is either true that he has lied to the probation officer and lied earlier to the court or no unlawful restraint and no aggravated assault and no burglary took place in this case. They're simply completely at odds.

> And it seems to me, if the court finds that an unlawful restraint or aggravated assault has occurred, then necessarily there has been no acceptance of responsibility, even though he has not testified at this sentencing hearing, apart from the statement that he made right after the government's factual basis. *He wasn't called upon to do that, he volunteered it; and it seems to me that he was trying to deflect responsibility away, and that is consistent with the position that he took in the two letters by his counsel to Brandon Brewer [the probation officer].*

(Tr. at 181–82 (emphasis supplied).) Finally, as we have noted, when Judge Barker asked Corbin to comment on the government's proffer, she did not ask Corbin to disclose where he had gotten the revolver and what he had done with it. To the contrary, Corbin did so on his own initiative and stopped only when Judge Barker admonished him that this subject was beyond the scope of Gilbert's testimony. (Tr. at 20–21.)

Under these circumstances, we discern no intrusion upon Corbin's privilege not to incriminate himself. Corbin did not refuse to discuss the circumstances surrounding his possession of the gun nor did he claim a fifth amendment right to remain silent. Instead, he willingly addressed this subject on at least two occasions without expressing any concern about self-incrimination. Nor was he threatened with any penalty that might excuse his failure to invoke the privilege.[27]

27. We note that effective November 1, 1992, Application Note 1 to section 3E1.1 was amended to read as follows:

> In determining whether a defendant qualifies [for the acceptance of responsibility reduction], appropriate considerations include, but are not limited to, the following:

> (a) truthfully admitting the conduct comprising the offense(s) of conviction, and truthfully admitting or not falsely denying any additional relevant conduct for which the defendant is accountable under § 1B1.3 (Relevant Con-

duct). Note that a defendant is not required to volunteer, or affirmatively admit, relevant conduct beyond the offense of conviction in order to obtain a reduction. . . . A defendant may remain silent in respect to relevant conduct beyond the offense of conviction without affecting his ability to obtain a reduction under this subsection. However, a defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility

Having put the fifth amendment question aside, we readily conclude that the district court committed no clear error in denying Corbin a reduction for acceptance of responsibility. The evidence was more than sufficient to support the court's finding that Corbin had used the gun to assault Eason and perhaps Killibrew as well. The district court was therefore justified in concluding that Corbin's attempts to portray a far more innocent scenario evinced a refusal to take responsibility for his conduct. Indeed, we find telling the remarks Corbin made in allocution just before Judge Barker passed sentence (and after she had already announced her decision not to grant him the reduction for acceptance of responsibility): Although Corbin continued to deny having done bodily harm to anyone, he seemed finally to concede that his encounter with Eason and Killibrew was more eventful than he had earlier represented to the probation officer and the court:

> DEFENDANT CORBIN: I waved the gun at her [Eason]. I pushed it, like that. That's how she got the scar on her face.
>
> As far as me and Rodney, we was wrestling, but you know what I mean, I didn't hit him with the gun; as far as me hitting him with the gun, I couldn't hit him with the gun.
>
> THE COURT: Well, why was he wrestling with you? Wasn't it to get the gun?
>
> DEFENDANT CORBIN: No, it wasn't to get the gun.
>
> THE COURT: And keep you away from Miss Eason?
>
> DEFENDANT CORBIN: No, it wasn't that.
>
> THE COURT: Hmm. Just a friendly little wrestling match, huh?
>
> DEFENDANT CORBIN: Yeah. We was all drinking, cussing at each other, fighting. Off and on.

(Tr. at 206–07.) Corbin's belated acknowledgement that he and the others had been

---

U.S.S.G. § 3E1.1 (Nov.1992) comment. (n. 1). As we noted in *White*, the amended commentary appears calculated to address the type of fifth amendment concerns Corbin has raised here. 993 F.2d at 151; *see also United States v. Hicks*, 978 F.2d 722, 726 (D.C.Cir.1992). However, it

fighting, that he had pushed the gun against Eason's face, and that he and Killibrew ended up in a struggle lends considerable confirmation to the government's version of events and exposes the self-serving and inaccurate character of Corbin's earlier statements. At the same time, Corbin's evident reluctance to concede the full violence of the encounter demonstrates his continued unwillingness to come to terms with what he really had done.

## III. CONCLUSION

Having found that Corbin had committed aggravated assault while in possession of the revolver, the district court correctly calculated Corbin's sentence using the guideline governing aggravated assault. The evidence, although largely hearsay, was more than sufficient to support this finding by a preponderance; proof beyond a reasonable doubt was not required. Furthermore, given the inaccurate and exculpatory nature of Corbin's voluntary statements regarding the offense, the district court did not err in denying him credit for acceptance of responsibility. We therefore affirm the judgment of the district court.

AFFIRMED.

---

also articulates the same distinction we have drawn between a defendant's silence and his voluntary misrepresentations as to his other conduct. Thus, even if we were to apply the new commentary retroactively (*see id.* at 726–27), the result would be no different.